**MUSICIANS' PROTECTIVE UNION LOCAL NO. 274 A. F. OF M., a labor organization, and James Adams, on his own behalf and on behalf of all others similarly situated**

v.

**The AMERICAN FEDERATION OF MUSICIANS OF the UNITED STATES AND CANADA.**

**Civ. A. No. 71–809.**

United States District Court,
E. D. Pennsylvania.

June 30, 1971.

Martin Techner, Milton Lazaroff, and A. Jay Molluso, Philadelphia, Pa., for plaintiffs.

Bernard Katz, Philadelphia, Pa., Ronald Rosenberg, VanArkel & Kaiser, Washington, D. C., for defendant.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### I. PRELIMINARY STATEMENT.

This case presents the question of whether an international union can expel from its ranks a local affiliate, whose membership is predominantly

**1228**

black, because the local refuses to accede to an order by the International requiring it to merge with another local whose membership is almost totally white, so as to eliminate the vestiges of dual unionism based upon race in a particular geographical area. The term "dual unionism" refers to the existence of two local unions with identical territorial and work jurisdiction.[1]

We hold that the order of the International expelling the Local under these circumstances is valid. The holding, in a sense, culminates an interesting chapter in the history of the labor movement, in that: (1) the American Federation of Musicians International has attempted for many years to end a pattern of segregation which historically had developed throughout the country in musicians unions; and (2) Philadelphia, the home of the two locals involved, is the only area in the country which still has dual unionism in the musicians sphere. We note at the outset that our deliberations will concern more than an analysis of the racial patterns within the International's local affiliates. For the case also requires us to probe: (1) the fundamental relationship between the international union and its local affiliates; and (2) the role of the courts in dealing with matters of the internal industrial jurisprudence of labor unions.

The case was tried to the Court on a stipulation of facts supplemented by some additional testimony. This opinion constitutes our findings of fact and conclusions of law in accordance with Fed.R. Civ.P. 52(a).

## II. THE COURT'S JURISDICTION.

Plaintiff, Musicians Protective Local No. 274 A. F. of M. ("Local 274") is the predominantly black local. It sues to enjoin defendant, The American Federation of Musicians Of The United States And Canada (the "International") from im-

plementing its order dated March 31, 1971 cancelling Local 274's charter. It also seeks invalidation of the expulsion. This being a dispute between two labor organizations, jurisdiction attaches under § 301(a) of the Labor Management Relations Act of 1947, 29 U.S.C. § 185(a). Defendant has abandoned its original contention that the Norris LaGuardia Act, 29 U.S.C. § 101 acts as a jurisdictional bar. Plaintiff has abandoned its claim to jurisdiction under § 102 of the Labor Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 412, and its contention that the suit may be maintained as a class action on behalf of Local 274's individual officers and members.

## III. DUAL UNIONISM BASED UPON RACE—THE HISTORICAL BACKGROUND.

Local 274 was organized in 1934 by a travelling band known as "Edwards Collegians", the members of which held International membership through Local 607, Huntingdon, West Virginia. The Local was chartered as a Philadelphia affiliate of the International on January 1, 1935. All of its original members were black. At that time Philadelphia already had a musicians local—Local 77 A. F. of M. ("Local 77"), none of whose members were black. Local 77 is the principal musicians' union in Philadelphia; it presently has over five thousand members (Local 274 has about five hundred members). Both locals then had, and continue to have, identical work and geographic jurisdictions, and according to the stipulation of facts, there was *no reason*, other than segregation by race, for their separate existence. Official publications of the International, prior to 1961, recognized the basis of this separation by listing Local 274 as a "colored" local to distinguish it from its white counterpart, Local 77.

---

1. The Court takes judicial notice of the distinction between dual unionism, as thus defined, and the more common situation where there are numerous unions affiliated with a given international in a given area, but with differing work jurisdictions, e. g., beer truck drivers, bakery truck drivers, over the road truck drivers, etc.

Membership figures also reflect the consequences of this history. At the time of the Order of Merger, failure to accede to which led to expulsion, Local 274 had approximately five hundred members, of whom approximately four hundred fifty were black and fifty were white. At its point of maximum growth, Local 274 had eleven hundred members, and apparently it never had more than about fifty white members, the first of whom were admitted sometime in the 1940's. Local 77 had no black members until 1963. At the time of the merger order, Local 77 had five thousand twenty members, of whom only twenty were black.[2]

The history just recited is not indigenous to Philadelphia. The record reflects that the International first began its efforts to eliminate dual unionism based upon race in 1954, at which time such dual unionism existed in thirty-eight localities throughout the United States. The International's efforts were an attempt to comply with the mandate of evolving public law and the policy of its own conventions. The Civil Rights Department of the International was assigned the responsibility for effecting the merger of the segregated locals. Over the course of the next several years, as a result of the International's policy mergers of dual locals occurred in thirty-seven localities.[3]

At the 70th Convention of the International in June 1967, Resolution No. 25 was proposed which called for a "factual and exhaustive report designed to prove to the membership as well as to the world at large the material benefits of Federation mergers to date * * *." The resolution as proposed would have had the Civil Rights Department "desist, and immediately discontinue its enthusiasm toward mergers" until there was evidence, in the form of a report, showing the merits of such mergers. As the resolution was finally adopted by the Convention, however, the latter language was deleted. In response to the resolution, the Report submitted by the International President of the 1968 Convention stated:

"[T]he elimination of dual unionism will improve the economic lot of all members and that it can be achieved without the submerging of minorities or the abridgement of any of their rights."

Since then, the International has continued its efforts to eliminate racial segregation in its local affiliates unabated.

On January 26, 1965, in an effort to deal with the Philadelphia situation, James Caesar Petrillo, Director of the International's Civil Rights Department (and former International President) contacted President James Adams of Local 274, and the leadership of Local 77, requesting a meeting with officials from both locals to work out a plan of *voluntary* merger. Through seven meetings between 1965 and 1970, conducted under the auspices and mediation of the International, no agreement for a voluntary merger was ever reached.[4]

2. Since the merger order, a large number of members of Local 274 have taken membership in Local 77.

3. The Chicago situation, however, bears mention. In 1964 the International formally ordered the merger of the Chicago locals upon the failure of the white local to voluntarily merge with the black local. Local 10, the white local, appealed the Executive Board Order to the International Convention, but the appeal was denied. The membership of Local 10 subsequently rejected the International's plan, whereupon the International placed the local in trusteeship to effectuate the merger. Since then, the transition has been far from satisfactory, and the minority membership is attempting, by amending the By-Laws, to extend the provisions of the merger agreement for an additional five years, from January 10, 1972 until January 10, 1977. *See* Local 10 v. Federation of Musicians, 47 L.R.R.M. 2234 (N.D.Ill.1964), discussed *infra*.

4. The Commission on Human Relations for the City of Philadelphia, aware of the segregated nature of the locals, also offered its assistance to the International in helping to merge the Philadelphia locals.

In December 1968, then President Kenin of the International advised the locals by letter of his intention to recommend to the International Executive Board ("IEB") that it issue an Order and Plan of Merger of Local 77 and Local 274 in the event the locals did not take some action to effect a voluntary merger by December 27, 1968. Throughout the negotiating period, at various membership meetings, a majority of Local 274's members voted not to merge, and efforts of the two locals subsequent to President Kenin's letter proved equally fruitless.

## IV. THE ORDER OF MERGER, THE HEARING THEREON, AND THE ORDER CANCELLING LOCAL 274's CHARTER.

On November 24, 1970, the new International President, Hal C. Davis, sent to the two locals an IEB Order requiring that they merge into one local. Accompanying the Order was a Plan of Merger.

The Order and Plan set out in detail the steps *both* locals should take to effectuate the merger, and set January 1, 1971 as the date for compliance. The Order and Plan provided, *inter alia*, that each member of the two unions should enjoy equal rights, privileges and benefits in the merged union. No member of either local was required to pay initiation fees to the merged union. Moreover, the Plan of Merger provided that, for the period from January 1, 1971 until June 7, 1976, only former members of Local 274 could be nominees for the following offices: Administrative Vice-President, Associate Secretary, two members of the Executive Committee, one member of the Examining Committee, two members of the Trial Board, one member of the Auditing Committee, two delegates to the Central Labor Union, Philadelphia, and two delegates to the

Central Labor Union, Camden. The Administrative Vice-President and the Associate Secretary were to be delegates *ex officio* to the International Convention. All other offices in the merged local were open to all members. The surviving entity of the merger was to be designated as "Philadelphia Musicians' Association, Local 77–274, A. F. of M."

The Order directed an authorized officer of each local to notify the International President on or before December 14, 1970, of its intention to comply with the Order, and of steps taken to fulfill that intention. The members of Local 274, at a special meeting called December 6, 1970, voted *not* to subscribe to the Order of Merger, and authorized the borrowing of $5,000 from its mortuary fund for legal fees to challenge the merger order. Local 77, on the other hand, agreed to abide by the Order.

On December 7, 1970, Local 274, by its counsel, in response to the Order, requested the International to hold a hearing on the question of whether the Order of Merger was proper or even authorized under the Constitution and By-Laws of the International. On January 22, 1971, Phil Lampkin, the travelling International representative assigned to and responsible for the locals in the area, having learned that a notification of compliance with the Order of Merger had not been received in the President's office by December 14, 1970, presented charges against Local 274. Thereafter he notified International President Davis of these charges, recommending either that the IEB place the Local in trusteeship, revoke its charter, or take whatever other action the IEB deemed appropriate.

In response to the foregoing, President Davis notified the Local of the charges, and pursuant to Article 6, Section 7 of the By-Laws,[5] designated In-

---

5. Article 6, Section 7 provides:
   "Charges against a local may be filed with the International President, Secretary-Treasurer or Executive Board. In the discretion of the President, or the Executive Board, the trial of said charges may be had before a body composed of the members of the Executive Board or of any sub-committee designated by it * * *."

ternational Vice-President Victor W. Fuentealba as a Subcommittee of the IEB to set a hearing for trial on the charges as required by the By-Laws. A hearing was held on March 12, 1971. At the hearing, counsel for Local 274 argued that the Constitution and By-Laws did not authorize the Order of Merger. Counsel further argued that Local 274 complied with the Order because it responded, as required by its terms, before the deadline date of December 14, 1970, in the form of counsel's letter of December 7th to the International.[6] This letter was offered into evidence along with the minute books of Local 274's meetings. The matter was then taken under advisement. Thereafter, upon consideration of the hearing report and the Recommendation of the Subcommittee, the IEB found the charges sustained and on March 31, 1971, issued the order cancelling Local 274's charter.

## V. DOES SEGREGATION EXIST IN THE MUSICIANS' UNIONS IN PHILADELPHIA—RESOLUTION OF THE FACTUAL ISSUE.

Local 274 has maintained throughout the course of this litigation that it is not a segregated local and therefore is not in violation either of the Civil Rights Act of 1964 (see *infra*) or of the International's policy. It asserts that membership has always been open to whites and that, even though there were no white members prior to the 1940's, the Local has never followed a policy of exclusion based upon race. The Local 274 officials who testified were emphatic on this point. They further contend that it is Local 77 that is the segregated local, since out of more than five thousand members, only 20 are black. Pointing out that the International has never conducted a hearing to determine whether Local 274 is *in fact* segregated, it is Local 274's position that the Order of the International Executive Board, even if based on lawful public policy, was invalid because, factually, Local 274 is not segregated.

■ This brings us to a threshold question: what is the yardstick for determining segregation? Is it Local 274's racial balance? Is it Local 274's "policy"? Or is it the entire Philadelphia situation, past, present and foreseeable future? The International opts for the latter, and the Court agrees.

The two locals were organized and chartered as "white" and "black" locals. Despite the passage of a generation which has brought enormous social change, the record reflects that Local 274 and Local 77 continue to be known throughout the Philadelphia area as the "black" and "white" locals. Numerically, of the five thousand and fifty (5050) *white* union musicians in Philadelphia, five thousand are members of Local 77. Of the four hundred and seventy *black* musicians, four hundred and fifty are members of Local 274. Such "token" membership of whites in Local 274 and blacks in Local 77 does not alter the reality of segregation by race. And the fact that the record reflects that neither Local 77 nor 274 apparently follows a present policy of segregation regarding applicants for membership does not alter our finding. The present existence of separate locals in Philadelphia with identical work and territorial jurisdiction, and with membership either overwhelmingly black or almost totally white is grounded exclusively on earlier and open segregation by race. Another important factor in the overview of the situation is the existence, in union practice, of a rule against raiding other locals.

6. We consider this defense to be without merit. The IEB Order of Merger required that the Local notify the International of its *intention* to comply by December 14, 1970. To say that the Local is not in default of the merger order because it responded to the order by requesting a hearing, and inferentially signifying its intention not to comply, is to beg the question. Neither do we deem it relevant, as counsel for Local 274 suggests, that International Representative Lampkin was unaware of counsel's letter when he presented these charges.

Both locals concede they must abide by this rule. Accordingly, to suggest that the condition will be corrected in the foreseeable future without merger is unrealistic.

Local 274's President Adams testified that the merger will not benefit the members of 274. He stated that the members consistently voted against merger because they would lose the prestige, reputation and goodwill in the community that over thirty years of meritorious effort have brought them. He expressed concern over the loss of control of their own affairs, the loss of their meetinghouse and the clubhouse liquor license, and opined that the reserved offices would not necessarily assure them a meaningful voice in the control of the merged locals. Perhaps his most striking remark was that:

> "[T]hey have given us no reason for a merger. The only effect that it would have would be that, not the only effect but one of the effects, is that the black leadership is constantly beginning again. This has been the history of the black in this system. They would get so far; and then the laws of somebody would set them back again. I am not concerned about anybody giving me anything. I only want what I've earned."

These considerations are not cognizable or even particularly germane in view of the underlying facts which have led us to find segregation by race, or at least substantial vestiges thereof, within the musicians' union locals in Philadelphia. However, it is important that we also consider the recent caselaw dealing with segregation, as it furnishes certain guidelines.

The Supreme Court has, over the last seventeen years, decided on numerous occasions that state imposed racial segregation violates the Fourteenth Amendment. The school cases are illustrative. The Constitutional principle has been well-settled since *Brown I*;[7] yet, the

command of *Brown II*[8] that dual school systems be eliminated and replaced by a unitary system has, after seventeen years and a plethora of decisions, still not been accomplished. Even where present segregation practices have been stopped, longstanding patterns of discrimination have persisted and continue to thwart any effort to achieve a unitary school system. It merely *begins* the inquiry, as Justice Brennan points out in Green v. County School Bd., 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), to say that the doors of previously all white schools are now open to blacks and vice versa. Beyond that first step lies the whole complex of issues concerning what steps have been taken to end segregation in the schools. It is these vestiges of segregation, resulting from historical patterns, whether accidental or intentional, that continue to occupy the attention of the Court.

In Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S. Ct. 1267, 28 L.Ed.2d 554 (1971), the Court considered whether desegregation plans for the Charlotte-Mecklenburg School System satisfied the Court's mandates to eliminate racially segregated public schools established and maintained by state action. The opinion recites that:

> "During the 1968–1969 school year the system served more than 84,000 pupils in 107 schools. Approximately 71% of the pupils were found to be white and 29% Negro. As of June 1969 there were approximately 24,000 Negro students in the system, of whom 21,000 attended schools within the city of Charlotte. Two-thirds of those 21,000 —approximately 14,000 Negro students—attended 21 schools which were either totally Negro or more than 99% Negro."

This distribution was brought about by a desegregation plan approved by the District Court in 1965 which was based upon geographic zoning with a free transfer

---

7. Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

8. Brown v. Board of Education, 349 U.S. 249, 75 S.Ct. 753, 99 L.Ed. 1083 (1955).

provision for those students desiring to take advantage of it. Petitioner, seeking further relief, instituted the action on the basis of Green v. County School Board, *supra*, which held that the burden was on the school board to come forward with a plan for desegregation that promised "realistically to work, and promises realistically to work now." *Id.* 391 U.S. at 439, 88 S.Ct. at 1694. Against the background of the racial makeup of the school system and prior patterns of segregation, the Court considered the duties of the school authorities and the scope of powers of the federal courts in the school segregation area. The 1965 plan did little to eliminate racial segregation and did not alter the fact of separate school systems for whites and blacks. Thus, the Court held, *inter alia*, that the district court has broad power to fashion a remedy to insure a unitary school system in default by the school authorities of their obligation to proffer acceptable remedies.

Summarizing the intent of the school segregation cases, the Court found:

"The objective today remains to eliminate from the public schools *all vestiges of state-imposed segregation.* Segregation was the evil struck down by *Brown I* as contrary to the equal protection guarantees of the Constitution. That was the violation sought to be corrected by the remedial measures of *Brown II*. That was the basis for the holding in *Green* that school authorities are 'clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch.' 391 U.S., at 437–438 [88 S.Ct. at 1694]." (emphasis supplied)

Applying the terminology of *Swann* to the present situation, we find here the vestiges of what once was open segregation, now frozen into an inertial pattern of dual unionism based upon race. These vestiges of segregation are rooted in the history and identity of the separate locals. Thus, it only begins our inquiry here to say that the doors of both locals are now open to blacks and whites. The question is not mooted or ended by this fact, for the truth of the matter is that, in view of the no-raiding rule, the continued existence of both locals will guarantee the continued existence of segregation in the Philadelphia unions. Against the background of decisions like *Swann*, it becomes patently obvious that the IEB acted properly in determining that such a condition cannot be permitted, and that the IEB, like the school boards, acted properly in coming forward with a plan to eliminate dual unionism based upon race.

## VI. IMPACT OF THE CIVIL RIGHTS ACT OF 1964.

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2, provides, *inter alia*:

"(c) It shall be an unlawful employment practice for a labor organization—

(1) to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin;

·(2) to limit, segregate, or classify its membership, or to classify or fail or refuse to refer for employment any individual, in àny way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race, color, religion, sex or national origin * * *."

The most apposite case yet decided under the Act is United States v. International Longshoremen's Assn., 319 F.Supp. 737 (D.Md.1970).

In *Longshoremen, the government* sought injunctive relief against certain locals of the International Longshoremen's Association and the Longshoremen's International for maintaining

segregated locals in the same port with separate hiring halls. The complaint alleged that the defendants had engaged in and were engaging in a pattern of discrimination against persons on account of their race in the operation of their labor organizations in the State of Maryland. The government sought a decree which would have (1) merged the segregated locals into a single union; (2) required that these locals operate a single hiring hall; and (3) discontinued the gang system for supplying longshoremen to employers in the Port of Baltimore, disbanding the gangs as then constituted and reorganizing them on a nonracial basis. Relevant statistical data reveals that Local 829, the white local, had approximately eleven hundred fifty-five members, and that since 1950 had only four negro members. Local 858 had approximately twelve hundred twenty-six members, five of whom were white. They worked under the same collective bargaining agreement, for the same companies, on the same ships, and occasionally in the same hatches at the same time. The government contended that this practice was violative of § 703 (c) of the Civil Rights Act of 1964. The defendants asserted that neither local nor the other defendants violated the Act, and that the government did not prove that segregation or racial classification of the membership of these two locals deprived individuals of equal employment opportunities.

The court found that the "maintenance of locals whose membership is segregated by race is a *per se* violation of Section 703(c)(2) of the Act" and that it was not necessary to make specific findings of deprivation of equal employment opportunity, since this subsection applies also to segregation or classification which would *"tend to deprive* any individual of employment opportunities * * * because of such individual's race * * *." Judge Harvey concluded by finding that:

> "The maintenance of separate locals for Negroes and whites performing the same duties in the same geographical area in itself would tend to deprive individual members of equal employment opportunities. * * *" *Id.* at 741–742.[9]

■ There are two principal areas in which the present case differs from *Longshoremen. First,* this suit arises from a dispute between two labor organizations and is brought by Local 274 under the Labor Management Relations Act of 1947. In *Longshoremen,* the *government* was suing for injunctive relief under the 1964 Civil Rights Act for violations of that Act. *Second,* in *Longshoremen,* there was a finding that the maintenance of separate locals for whites and blacks in itself would tend to deprive individual members of equal employment opportunities. Here, the evidence adduced at trial indicated that, unlike *Longshoremen,* individual musicians obtain most jobs through their own efforts rather than through the Union apparatus, and the impact of the separate locals upon job opportunity is a bit less clear. However, these factors do not make the principles of *Longshoremen* inapplicable. We agree with Judge Harvey's conclusion and find that the segregated musicians' locals are *per se* violative of Title VII.[10]

9. *Accord,* Hicks v. Crown Zellerbach Corp. 310 F.Supp. 536 (E.D.La.1970).

10. This interpretation is consistent with recent interpretations of the Civil Rights Act, at least one of which has struck down, on the basis of the Act, even seemingly neutral membership or employment requirements, where their continued application would perpetrate the effects of past discrimination. In Griggs v. Duke Power Company, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), the Supreme Court considered whether an employer was prohibited by provisions of the Civil Rights Act from requiring a high school education or passing of a standardized general intelligence test as a condition of employment or in transfer ·to jobs. The petitioners argued that neither standard was significantly related to successful job performance and, in fact, operated to disqualify blacks at a substantially higher rate than white applicants where the

While, therefore, because of its procedural setting, this action does not arise under the Civil Rights Act, the Act does provide substantive provisions which we consider applicable and against which the actions of the International must be measured.

## VII. THE POWER OF THE INTERNATIONAL TO ORDER THE MERGER.

Local 274 raises two separate questions concerning whether the International has acted within the framework of its Constitution and By-Laws. They are whether the International had the power: (1) to order a Plan of Merger, and (2) to revoke the Charter of Local 274. Local 274 contends that the International lacked the power under its Constitution and By-Laws either to order the merger of Local 274 with Local 77 or to revoke 274's charter. We will consider first the merger order; then the power to expel.

Local 274's argument with respect to merger stems from Article 3, Section 8 of the International's Constitution:

"If, in the opinion of the International Executive Board, it will be in the *best interest of the locals* and the Federation, two or more locals *may merge* under such conditions as may be recommended by the International Executive Board." (emphasis supplied)

The Local contends that this language authorizes only consensual mergers. Seeking to buttress this position with a legislative history type of argument, the Local points out that, at the Cleveland Convention in June of 1955, where the relevant Constitutional section was adopted, the resolution *originally* presented to the body read:

"Section 8. If in the opinion of the International Executive Board, it will be in the best interest of the locals and the Federation, two or more locals *may merge or be merged* under such conditions as may be recommended by the International Executive Board." (emphasis supplied)

The Local argues that the deletion of the phrase "or be merged" from the accepted draft indicates the decision *not* to grant the power to *order* merger to the IEB. The Court, however, considers this "legislative history" to be inconclusive, and the section not to be preemptive as to the question of merger.

Counsel for the International, in rejecting the Local's contention that the Constitution authorizes only consensual merger, cite to us several provisions of the Constitution and By-Laws which, they maintain provide clear authority for the issuance of the Order.

Article 1, Section 5 of the By-Laws provides:

"Section 5-B. Matters not covered by the Constitution or By-laws shall be in the discretion of the Board, which shall have power to adopt such rules, supplementing said Constitution and By-laws, or covering any matter not contained therein, as it may deem proper, in addition to determining and announcing the policies of the Federation, all of which rules, matters and policies shall have equal force and effect with the Constitution and By-laws.

Section 5-C. The Board may, from time to time, repeal, change or amend any such rules, policies or directions, with respect to any such matters.

Section 5-D. The *Board shall have a general supervision of all matters pertaining to the Federation and shall have complete jurisdiction and power of disposition of all matters and ques-

---

jobs in question formerly had been filled only by white employees as part of a long-standing practice of giving preference to whites. The Court found that it was the intent of Congress in enacting Title VII "to achieve equality of employment opportunities and remove barriers that have operated *in the past* to favor an identifiable group of white employees over other employees" and held that, "Under the Act, practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices." *Id.* at 429, 91 S.Ct. at 853.

*tions referring or relating to the Federation or any of its members or any local thereof,* as well as of all matters and questions in which the said Federation or any of its locals or members may be interested, or by which any of them may be in anywise affected. (emphasis supplied)

\*    \*    \*    \*    \*    \*

Section 5–I. The Board, or a subcommittee thereof appointed by said Board, whichever the case may be, shall have *full and complete power and authority to make such rules or orders which, in their judgment, may be necessary or desirable in connection with any matters or questions concerning or affecting the Federation, or any of its locals or members,* or in connection with any hearing or investigation as to any such matters of questions, including the power, after due notice to the local and an opportunity for a hearing, to order any changes, revisions, deletions or additions in the Constitution or By-laws of any local deemed necessary by the Board in the best interests of the Federation, the local or its members." (emphasis supplied)

Moreover, Article 3, Section 4 of the Constitution provides:

"Section 4. The acceptance of a charter for a local of the Federation shall imply upon the part of said local its agreement to comply with, observe and conform to all the provisions of the Constitution of the Federation, its By-laws, Standing Orders, Standing or Special Resolutions and directions of any Convention or any order or direction of the Executive Board or a subcommittee thereof or any duly authorized officer of the Federation, then in force or thereafter made or enacted."

The United States District Court for the Northern District of Illinois dealt with virtually the same question as is before us in Local 10 v. Federation of Musicians, 47 L.R.R.M. 2234 (N.D.Ill.1964). The case involved the Chicago musicians situation which we have already adverted to. (See footnote 3, *supra.*) In up-

holding the power of the International to impose a trusteeship on the recalcitrant white local which refused to merge with a black local (the opposite of the Philadelphia situation), Judge Julius Hoffman found that Article 3, Section 8 of the International Constitution *authorized* an Order of Merger, rejecting Local 10's contention that this section requires the approval of the membership. Even though the statement was by way of dictum, we find Judge Hoffman's conclusion to be well-founded.

■ In our view, the Order of Merger is within the ambit of the grant to the Board of "complete jurisdiction and power of disposition of all matters and questions referring or relating to the Federation or any of its members or any local thereof" and "full and complete power and authority to make such rules or orders which, in their judgment may be necessary or desirable." And, the acceptance of the charter subjects the local to the obligation to comply with the By-Laws and directions of the International Executive Board, including, in our view, the Order of Merger.

■ This interpretation of the Constitution and By-Laws by the IEB we note cannot be set aside by the courts unless arbitrary and unreasonable. *See, e. g.,* Couie v. Local Union No. 1849, 51 Wash.2d 108, 316 P.2d 473, 478 (1958); and DeMille v. American Federation of Radio Artists, 31 Cal.2d 139, 187 P.2d 769, 775 (1947), where the court stated:

"The practical and reasonable construction of the Constitution and bylaws of a voluntary organization by its governing board is binding on the membership and will be recognized by the courts."

There is nothing in the Constitution or By-Laws which prohibits an order of merger. We do not find the interpretation of the Constitution and By-Laws by counsel for the International to be reasonable and arbitrary. We conclude that, under the circumstances of this case, the IEB possessed the power to order a merger.

■ Having decided that there exists sufficient constitutional authority for the issuance of the Order of Merger, we come to the question of the validity of the order expelling Local 274 for failure to accede to the merger. In that regard we find that the International Constitution and By-Laws contain ample authority for charter revocation. Article 3, Section 4 of the Constitution (cited in part above) provides:

"Section 4. The acceptance of a charter for a local of the Federation shall imply upon the part of said local its agreement to comply with, observe and conform to all the provisions of the Constitution of the Federation, its By-laws, Standing Orders, Standing or Special Resolutions and directions of any Convention or any order or direction of the Executive Board or a sub-committee thereof or any duly authorized officer of the Federation, then in force or thereafter made or enacted. A violation of any such provisions of the Constitution, By-laws, Standing Orders, Standing or Special Resolutions or directions shall subject such local to expulsion at the discretion of the Executive Board or a sub-committee thereof. The Executive Board may also, on granting such charter impose such additional conditions and require such additional agreements on the part of such local as the Executive Board may deem necessary or desirable."

Article 6, Section 2 of the By-Laws provide:

"Section 2. If a local is found guilty of violating or failing to comply with any provision of the Constitution of the Federation, its By-laws, Standing Orders, Standing or Special Resolutions or directions of any Convention or any order, direction or verdict of the Executive Board or a sub-committee thereof, or any duly authorized officer of the Federation, then such local shall be subject to expulsion from the Federation by and in the discretion of the Executive Board or a sub-committee thereof, and the President shall carry out and execute the de-cision of the said Board or sub-committee."

We conclude that these sections empower the International Executive Board to revoke the charter of a local affiliate.

## VIII. THE POSTURE OF THE FEDERAL COURTS IN MATTERS INVOLVING INTERNAL UNION AFFAIRS.

■ The questions we have been called upon to decide, though certainly of public concern, essentially involve matters of internal union affairs. Both the Supreme Court and the Court of Appeals for the Third Circuit have recently adverted to the principles underlying internal union democracy: that unions, like other voluntary associations, are to govern their own internal affairs with minimal governmental interference. This is a fundamental premise of our national labor policy. Thus, in International Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers, and Helpers, A.F.L.-C.I.O. v. Hardeman, 401 U.S. 233, 91 S.Ct. 609, 28 L.Ed.2d 10 (1971), the Supreme Court considered the question whether the district court had applied the proper standard of judicial review to the findings of a union disciplinary proceeding in which the respondent was found guilty of creating dissension in the local and of using force to restrain an officer from discharging the duties of his union office. The Court held, inter alia, that § 101(a) (5) of the Labor-Management Reporting and Disclosure Act, 29 U.S.C. § 411(a) (5), does not empower courts to determine what conduct may warrant disciplinary action by a union against its members, and that the proper standard of judicial review is whether some evidence was produced by the charging party at the disciplinary hearing to support the charges made. This holding is consistent with the "apparent congressional intent to allow unions to govern their own affairs * *." Id. at 246, 91 S.Ct. at 617.

In the case of Lewis v. American Federation of State, County & Municipal Employees, 407 F.2d 1185 (3d Cir. 1969),

the Court of Appeals considered the scope of judicial review under the Labor-Management Reporting and Disclosure Act and concluded that a limited scope of review was required since "we deem such a limitation to be vital if we are to prevent the federal courts from becoming a super-international trial board appeals tribunal antithetical to the concept of union self-determination as reflected in the spirit of our national labor policy." Judge Aldisert stated that courts:

> "must avoid overzealous intervention in the internal affairs of unions with its concomitant atrophic effect on the ability of the organization to function as a disciplined unit, being careful not to subject the union's interpretation of its own industrial jurisprudence to the 'removed, untutored, and possibly antipathetic judgment of a court.'" *Id.* at 1192.

These cases illustrate the continuing viability of the policy of internal union democracy. It is obvious that this policy dictates a limited judicial role in union affairs; that absent unreasonable and arbitrary action by the union, it is in the best interests of unions and their members to govern themselves, and therefore it would be improvident to substitute the "removed" and "untutored" judgment of the courts for that of union tribunals.

## IX. DID THE INTERNATIONAL ACT IMPROPERLY IN ORDERING THE MERGER AND THEN IN EXPELLING LOCAL 274 FOR FAILURE TO MERGE?—CONCLUSION.

In stating our conclusion with respect to whether the International acted improperly in ordering the merger and then in expelling Local 274 for failure to merge, we consider, *inter alia,* the following matters which have been the subject of findings in this opinion:

The musicians' unions in this country have evolved through an historical pattern which brought dual unionism based upon race to some thirty-seven cities. The International has determinedly attempted to end this pattern, and has succeeded in doing so in every city but Philadelphia. Union musicians in Philadelphia are essentially segregated into two unions. The non-segregation policy announced by each has not altered the racial pattern, and the presence of the non-raiding rule makes it unlikely that it will be altered. The vestiges of actual segregation have become frozen into a pattern of dual unionism based upon race. This pattern is in violation of the policy of the Civil Rights Act of 1964. The International, through its Constitution and By-Laws, had the power to order Locals 274 and 77 to merge, and did so. Although Local 77 has acceded to the merger order, Local 274 has expressly and repeatedly failed to do so. Local 274 was given a fair and adequate hearing with respect to its objections to the merger order. Moreover, the charges that Local 274 had failed to merge have been sustained. The International, through its Constitution and By-Laws, possesses the power to expel a local affiliate from International status if it fails to comply with a lawful order of the International Executive Board.

As we have seen, the scope of review by the federal courts is limited on matters involving internal union affairs. We cannot substitute our judgment for the governing union body. In view of the matters just recited, we cannot and do not hold that the expulsion of Local 274 by the International was in violation of the union's Constitution and By-Laws. To the contrary, we find that the International acted in a manner consistent with public policy and with its own internal laws. Accordingly, judgment will be entered for defendant.