UNITED STATES of America,
Appellee,

v.

INTERNATIONAL LONGSHOREMEN'S
ASSOCIATION, an unincorporated association, Atlantic Coast District, International Longshoremen's Association, an unincorporated association, Locals 829 and 858, I. L. A., Baltimore, Maryland, unincorporated associations, Appellants.

UNITED STATES of America,
Appellant,

v.

INTERNATIONAL LONGSHOREMEN'S
ASSOCIATION, an unincorporated association, Atlantic Coast District, International Longshoremen's Association, an unincorporated association, Locals 829 and 858, I. L. A., Baltimore, Maryland, unincorporated associations, Appellees.

Nos. 71–1367, 71–1386.

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 8, 1971.

Decided May 3, 1972.

Julius Miller, New York City (Gleason & Miller, New York City, on brief), for International Longshoremen's Assn., Atlantic Coast District, and Locals 829 and 858.

John W. Davis, Atty., Dept. of Justice (David L. Norman, Asst. Atty. Gen., David L. Rose, Atty., Dept. of Justice, and George Beall, U. S. Atty., D. Md., on brief), for the United States.

Before BOREMAN, Senior Circuit Judge, and BRYAN and BUTZNER, Circuit Judges.

BUTZNER, Circuit Judge:

This appeal and cross-appeal arise out of an action [1] brought by the Attorney General under Title VII of the Civil Rights Act of 1964 [2] to combat racial discrimination that limits employment opportunities for longshoremen in the Port of Baltimore. The district court ordered the International Longshoremen's Association, its Atlantic Coast District and two of its racially segregated locals [3] to operate a single hiring hall, to institute a non-discriminatory seniority system, and to fill permanent vacancies in longshoreman gangs on the basis of seniority instead of race. No party has assigned error to these provisions of the court's decree, and they have been implemented pending this appeal.

The district court also ordered the merger of predominately white local 829 with predominately black local 858. The ILA, the District, and the locals appeal from this order. Judge Boreman and Judge Butzner join in affirming the district court on this issue. Judge Bryan dissents.

The district court refused the government's request that racially segregated

---

1. United States v. International Longshoremen's Ass'n, 319 F.Supp. 737 (D.Md. 1970).

2. 42 U.S.C. § 2000e–6(a) (1970), provides: "Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by this subchapter, and that the pattern or practice is of such a nature and is intended to deny the full exercise of the rights herein described, the Attorney General may bring a civil action in the appropriate district court of the United States by filing with it a complaint (1) signed by him (or in his absence the Acting Attorney General), (2) setting forth facts pertaining to such pattern or practice, and (3) requesting such relief, including an application for a permanent or temporary injunction, restraining order or other order against the person or persons responsible for such pattern or practice, as he deems necessary to insure the full enjoyment of the rights herein described."

3. The International Longshoremen's Association, the Atlantic Coast District, and locals 829 and 858 sometimes will be referred to collectively as the union.

longshoreman gangs immediately be re-organized on a non-racial basis. Judge Boreman and Judge Bryan join in affirming the district court on this issue. Judge Butzner dissents.

The effect of this division in the court is to affirm the district court's order in its entirety.

## I

## MERGER OF THE LOCALS

Local 829 was chartered in 1913, and its membership always has been predominately white. The local has no rule that excludes black workers, but an applicant must be sponsored by a member of the local and be approved by a majority of its membership. Moreover, a former president of the local, who held office after the enactment of the Civil Rights Act of 1964, told black applicants that they would have more opportunity to work if they joined the black local. Since 1960, all of the approximately 757 persons admitted to membership were white, and currently the local has only four black longshoremen among its membership of about 1,155.

Local 858 was chartered in 1914, and it has always been composed almost entirely of black persons. It also requires an applicant to be sponsored by a member and to be approved by a majority of its membership. Since 1964, it has admitted 261 black and two white persons. Currently there are only five white longshoremen in its membership of approximately 1,226.

Both locals are members of the ILA and its Atlantic Coast District. Both are parties to the same collective bargaining agreement and their members receive the same rate of pay. Both operate through a system of permanent gangs of 15 to 20 men. New members of the locals obtain work by filling temporary vacancies in a particular gang. When a permanent vacancy occurs, the gang leader selects a replacement who must be approved by other members of the gang. Gangs from both locals are assigned to ships in the Port when stevedores call the hiring halls to place job orders. When calling for gangs, the stevedores maintain a rough form of seniority based primarily on the status of the leader and the performance of his gang.

All members of local 858's gangs are black. All of 829's gangs consist of white longshoremen with two exceptions. This local has a checkerboard gang consisting of both black and white members, but black members of this gang work less desirable jobs. Another gang working out of the white local's hiring hall is composed solely of black longshoremen from both locals.

The evidence is undisputed that black and white gangs possess equal abilities and are capable of doing the same work. Gangs from both locals work for the same stevedores on the same ships and in the same hatches. Since there is no substantial difference in the locals except race, we conclude that the evidence fully substantiates the trial court's finding that the ILA chartered and maintains segregated locals in the Port of Baltimore. The presence of a few members of the opposite race in each local and the absence of racially restrictive bylaws do not invalidate the district judge's ruling.

Section 703(c) (2) of the Civil Rights Act of 1964 declares that it shall be an unlawful employment practice for a labor organization to segregate or classify its membership on the basis of race in any way which would "tend to deprive any individual of employment opportunities." [4] The district judge found

---

4. Section 703(c) (2), 42 U.S.C. § 2000e-2 (c) (2) (1970), provides:

"It shall be an unlawful employment practice for a labor organization—

.    .    .    .    .

(2) to limit, segregate, or classify its membership, or to classify or fail or

refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for em-

that the maintenance of the ILA's segregated locals is a per se violation of § 703(c) (2). He held:

"The maintenance of separate locals for Negroes and whites performing the same duties in the same geographical area in itself would tend to deprive individual members of equal employment opportunities. As firmly established in Brown v. Board of Education, 347 U.S. 483, 494, 74 S.Ct. 686, 98 L. Ed. 873 (1954), the sanctioning of racially separate groupings in schools is inherently discriminatory, and this principle applies with equal force to cases such as the pending one where equal employment opportunities are involved. The doctrine of 'separate but equal' has long since been laid to rest in other areas . . . No valid reason has been advanced by defendants for this doctrine's exhumation to justify the maintenance of racially segregated unions whose members work side by side as longshoremen." 319 F.Supp. at 741.

We agree with the district judge that the maintenance of racially segregated locals inevitably breeds discrimination that violates the Act. Racial segregation limits both black and white employees to advancement only within the confines of their races. The position that would rightfully be an employee's, but for his race, may be filled by a person of lower seniority or inferior capability because the job traditionally has been reserved for either a white person from one local or a black person from the other. Even though union officials strive in good faith to administer their duties impartially, they cannot avoid this inherent inequality, and its consequent violation of the Act. Indeed, so obvious is the discrimination that arises from segregated unions, in every case, save one, courts

have ordered or approved mergers. United States v. Jacksonville Terminal Co., 451 F.2d 418 (5th Cir. 1971); Musicians' Protective Union, Local 274 v. American Federation of Musicians, 329 F.Supp. 1226 (E.D.Pa.1971); United States v. Chesapeake & Ohio Railway Co., 3 EPD ¶ 8331, at 7175 (E.D.Va. 1971); Hicks v. Crown Zellerbach Corp., 319 F.Supp. 314 (E.D.La.1970); United States v. Local 189, United Papermakers and Paperworkers, 301 F.Supp. 906 (E.D. La.), aff'd 416 F.2d 980 (5th Cir. 1969); Chicago Federation of Musicians, Local 10 v. American Federation of Musicians, 57 LRRM 2227 (N.D.Ill.1964). *Contra*, United States v. International Longshoremen's Association, 334 F.Supp. 976 (S.D. Tex.1971).

■ The wisdom of Judge Harvey's conclusion is illustrated by the record in this case. The evidence discloses that although there are more black gangs working in the Port than white gangs, black longshoremen work fewer hours than white longshoremen and on the average earn less money. Moreover, the black gangs traditionally work more of the "dirty" cargoes than their white counterparts.[5] The discrepancy in opportunities for work available to black and white longshoremen is due partly to the fact that most of the gearmen, mechanics, and foremen are members of the white local.[6] Since these men are not hired through the gang system, the defendants contend that the employers' preference for white workers in these classifications cannot be attributed to the union. These facts partially explain the discrimination against black longshoremen but they do not justify it. The record does not establish that black employees are unable to work satisfactorily as gearmen, mechanics, and foremen.

---

ployment, because of such individual's race, color, religion, sex, or national origin. . . . "

5. These cargoes include fish meal, bone meal, feather meal, tapioca, ore, animal hides, roots, fertilizers, and loose material requiring shoveling and manual labor.

6. The district judge found that in the contract year 1966–67, white longshoremen on the average worked 335 more hours per man than did black longshoremen; in 1967–68, white longshoremen worked 241 more hours per man; in 1968–69, 147 more hours per man, and in 1969–70, 120 more hours per man.

■ Abolition of the dual hiring halls and the other reforms decreed by the district court do not eliminate the necessity of merging the locals. The ILA's failure to secure equal employment opportunities for its black members in all jobs for which they are qualified is an example of the inherent inequality that the district judge correctly concluded can be remedied only by merger. Apart from further litigation, discrimination against black workers who aspire to non-gang jobs, such as gearmen, mechanics, and foremen, can only be accomplished by bargaining with the stevedores. But the officers of the white local owe no duty to the members of the black local, and it is unrealistic to expect them to participate in hard bargaining on behalf of black longshoremen. The president of the white local, while conceding that he knew members of his local worked 300,-000 hours more than members of the black local in 1968, admitted he had done nothing to correct this disparity because it was "not within my power." At best, the union's committee [7] approaches the bargaining table with divided legal responsibilities and loyalties. However, merger of the locals will place on all bargaining representatives, not just black bargaining representatives, the statutory duty to eliminate racial discrimination throughout the Port. Steele v. Louisville & Nashville Railroad Co., 323 U.S. 192, 203, 65 S.Ct. 226, 89 L.Ed. 173 (1944).

■ The union's officers, including the black officers of local 858, oppose merger. Their principal argument against the district court's decree is the claim that merger of the locals infringes on the workers' right to the freedom of association guaranteed them by the first amendment. This argument misapprehends the court's order. Merger will not prevent longshoremen from associating to achieve economic and political goals. The order does no more than prohibit exclusion from association on the ground of race. There is no warrant in the Constitution for a union to retain, even by majority preference, racially segregated locals that tend to deprive some black members of equal employment opportunities. The governing principles were stated by Mr. Justice Black when the Court held that right-to-work laws did not deprive union members of the protection afforded by the first amendment:

> "There cannot be wrung from a constitutional right of workers to assemble to discuss improvement of their own working standards, a further constitutional right to drive from remunerative employment all other persons who will not or can not, participate in union assemblies. The constitutional right of workers to assemble, to discuss and formulate plans for furthering their own self interest in jobs cannot be construed as a constitutional guarantee that none shall get and hold jobs except those who will join in the assembly or will agree to abide by the assembly's plans. For where conduct affects the interests of other individuals and the general public, the legality of that conduct must be measured by whether the conduct conforms to valid law, even though the conduct is engaged in pursuant to plans of an assembly." Lincoln Federal Labor Union 19129 v. Northwestern Iron & Metal Co., 335 U.S. 525, 531, 69 S.Ct. 251, 254, 93 L. Ed. 212 (1949).

The district court's order does not conflict with NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), and Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430 (1945), on which the union primarily relies. These cases do not create a right in white men or black men to avoid association with persons of the other race. On the contrary they are leading authorities charting the right of all persons to associate for political and economic goals.

---

7. The ILA, the District, and locals 829 and 858 are all parties to the collective bargaining agreement.

## II

### THE GANG SYSTEM

The United States cross-appealed from that part of the district court's order that denied the government's request to desegregate the gangs by providing for a daily shape-up system, or, as an alternative, reformation of each permanent gang.[8]

The evidence discloses that segregation of the gangs accounts in part for the fact that individual black longshoremen work fewer hours and earn less than their white counterparts. The district court found that most stevedores employ approximately equal numbers of white and black gangs. Since the white local has 30 gangs and the black local 47 gangs, an approximately equal division of the work between the gangs along racial lines results in less work for black individuals. *Cf.* Boudreaux v. Baton Rouge Marine Contracting Co., 437 F.2d 1011, 1013 (5th Cir. 1971); United States v. International Longshoremen's Association, 334 F.Supp. 976, 978 (S.D.Tex. 1971).

There is another way in which the union sponsored segregated gang system hampers equal employment opportunities. Many of the longshoremen in both locals are not attached to permanent gangs. They fill temporary vacancies from day to day. But progress toward better jobs within a gang, vacation benefits, and pensions depend to a large extent on working regularly in a permanent gang. Therefore, assignment to gangs according to race, instead of seniority and ability, has a lasting discriminatory effect beyond the weekly wages that a longshoreman earns.

The district judge recognized that segregation of the gangs contributed to unequal employment opportunities and for that reason he ordered that permanent vacancies in the segregated gangs be filled by recourse to seniority instead of race. This was a commendable step, but the government questions whether it

will prove sufficient to remedy the deep-seated racial inequality that exists in the Port, and the union offers no realistic estimate of the time required for this reform to desegregate the gangs.

The district court based its refusal to order the shape-up on two grounds. First, it decided that the relief it provided was sufficient to remedy the violations of the Act. Secondly, the court held that it must balance the Act's prohibition against racial discrimination with the business purpose of the gang system. Considering the evidence in this light, it concluded that the change to a daily shape-up "would decrease the efficiency of and create hazardous conditions for the work being performed by longshoremen in the Port of Baltimore." 319 F.Supp. at 744. In short, the court determined that business necessity justified the retention of the gang system.

After the district judge wrote his opinion, four cases were decided which deal with the defense of business necessity. In Griggs v. Duke Power Co., 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed. 2d 158 (1971), Mr. Chief Justice Burger said:

"What is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification.

. . . The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited."

We dealt with the business necessity test in Robinson v. Lorillard Corp., 444 F.2d 791, 798 (4th Cir. 1971), where Judge Sobeloff wrote:

"[T]he applicable test is not merely whether there exists a business purpose for adhering to a challenged practice. The test is whether there exists

---

8. The government suggested the alternative remedy after the district court filed its opinion, and the court declined to reopen the case to consider it.

an overriding legitimate business purpose such that the practice is necessary to the safe and efficient operation of the business. Thus, the business purpose must be sufficiently compelling to override any racial impact; the challenged practice must effectively carry out the business purpose it is alleged to serve; and there must be available no acceptable alternative policies or practices which would better accomplish the business purpose advanced, or accomplish it equally well with a lesser differential racial impact."

Judge Feinberg, writing for the Second Circuit in United States v. Bethlehem Steel Corp., 446 F.2d 652, 662 (2d Cir. 1971), stated a similar rule:

"Necessity connotes an irresistible demand. To be preserved, the seniority and transfer system must not only directly foster safety and efficiency of a plant, but also be essential to those goals. . . . If the legitimate ends of safety and efficiency can be served by a reasonably available alternative system with less discriminatory effects, then the present policies may not be continued."

And recently the Fifth Circuit adopted a standard no less stringent. As Judge Dyer explained in United States v. Jacksonville Terminal Co., 451 F.2d 418, 451 (5th Cir. 1971):

"[T]he Terminal was required to prove not only that the seniority systems and restrictions promote safe and efficient operation but also that they are essential to these goals."

There is no merit in the union's suggestion that the business necessity test restricts only employers and not unions. In the leading case on the subject, Local 189, United Papermakers and Paperworkers v. United States, 416 F.2d 980, 989 (5th Cir. 1969), Judge Wisdom specifically applied the test to unions:

"When an employer *or union* has discriminated in the past and when its present policies renew or exaggerate discriminatory effects, those policies must yield, unless there is an overriding legitimate, nonracial business purpose." [Emphasis added.]

The daily shape-up proposed by the government would reduce racial discrimination. It is used in other ports, and its introduction has been followed by a decline in accident rates.[9] A number of witnesses expressed the opinion that the daily shape-up is less efficient than a system of permanent gangs, but they furnished no objective production statistics to prove their thesis.

Speaking for myself, and not for my brothers, I conclude that the union has not borne the burden of proof required by recently decided cases that deal with the business necessity test. Undoubtedly the present system promotes "safe and

---

9. Comparison of accident rates in various ports is difficult because of differences in the cargoes handled in each port. However, some rough estimate of the effect of changing from a gang system to a daily shape-up can be obtained by comparing the accident rate in a given port before and after a change in systems.

In 1965 Galveston's rate was 136.6 accidents per million man hours worked. In 1966 the Port changed to a daily shape-up system and the rate increased to 141.9. However, in subsequent years the rate decreased significantly under the shape-up system. In 1967 it was 126.4; 109.5 in 1968; and 94.5 in 1969.

The Houston accident rate for 1965 and 1966 under permanent gangs was 100.3 and 84.5, respectively. The daily shape-up system was instituted in 1967, and the accident rate declined to 74.6. In 1968 it increased to 80.6; and in 1969 it decreased to 70.0.

In Jacksonville before adoption of the daily shape-up system the rate in 1965 was 89.6, and in 1966, 93.4. The daily shape-up was adopted in 1967, and the rate increased to 102.0. In 1968 it decreased to 92.0, and in 1969 it decreased further to 79.6.

Thus, in three ports that recently changed from permanent gangs to the daily shape-up, the accident rate in 1969 was lower than it had been in the last year that the ports operated under permanent gangs. Of course, the shape-up can-

efficient operation," [10] but I find in the evidence no "overriding legitimate business purpose" [11] necessary for safety and efficiency that justifies retention of the segregated gangs. Other ports in this country function without using the Baltimore system.

Therefore, I would remand the case for further proceedings. Almost a year has passed since the reforms ordered by the district judge were instituted. If his decree has eliminated segregated gangs and equalized the work and wages of similarly qualified black and white longshoremen, no further relief will be necessary. But if racial discrimination still adversely affects black longshoremen, I would require reconsideration of the remedies proposed by the government and consideration of other remedies the union or the stevedores may wish to suggest. The district court should seek "a reasonably available alternative system with less discriminatory effects" to serve the "legitimate ends of safety and efficiency." [12] The court need not limit relief to the imposition of the daily shape-up. The system of permanent gangs has many advantages, and it is not inherently discriminatory. Only when the gangs are organized along racial lines is the Act violated. Therefore, I would not require the discontinuation of permanent gangs if they can be reorganized so that all longshoremen have equal employment opportunities.

Since neither of my brothers share my views about the merits of the government's cross-appeal, the judgment of the district court is affirmed in its entirety.

Affirmed.

BOREMAN, Senior Circuit Judge, concurring in part and stating his view, in which he is joined by Circuit Judge BRYAN, with respect to "THE GANG SYSTEM":

I concur in that portion of Judge Butzner's opinion pertaining to the merger of Local Unions Nos. 829 and 858, the abolition of dual hiring halls, and the points discussed generally in his opinion under the heading "MERGER OF THE LOCALS."

I find myself in disagreement with part II of Judge Butzner's opinion under the heading "THE GANG SYSTEM" in which he would hold the District Judge Harvey erred in refusing to order the immediate desegregation of the established gangs of workers and in rejecting the Government's proposal to require the adoption of a daily shape-up system. I would affirm the district judge on this point and I am authorized by Judge Bryan to state that he shares my views in this connection and joins in such affirmance.

The opinion of the district court in United States v. International Longshoremen's Ass'n is reported at 319 F. Supp. 737 (D.Md.1970). Under the heading *Injunctive Relief,* 319 F.Supp. 742, et seq., the court discussed at length the relief sought by the Government and the contentions advanced by the parties, pro and con. It is clear that the court was keenly aware that nonracial business purposes are dominant considerations along with others such as safety, efficiency, and productivity.

"    .    .    In deciding upon appropriate injunctive relief here, this Court is faced with a balancing process On the one hand, the Court must consider the effects of the many years of racial segregation of the members of Locals 829 and 858, insofar as such practice has or may have tended to deprive individual union members of employment opportunities. Against these considerations must be weighed the effects that a decree reorganizing longshoring operations might have on

not be isolated as the only reason for the decline in accident rates. Other undisclosed factors may have played an important role.

10. United States v. Jacksonville Terminal Co., 451 F.2d 418, 451 (5th Cir. 1971).

11. Robinson v. Lorillard Corp., 444 F.2d 791, 798 (4th Cir. 1971).

12. United States v. Bethlehem Steel Corp., 446 F.2d 652, 662 (2d Cir. 1971) ; *see also* Robinson v. Lorillard Corp., 444 F.2d 791, 798 (4th Cir. 1971).

the entire industry in the Port of Baltimore. Far-reaching relief which would adversely affect productivity and efficiency to such an extent as to discourage the use of the Port by shipping interests would reduce the availability of the very employment which is sought to be protected. What is required here is a decree which would eliminate, as far as possible, past discriminatory practices and yet would have a minimal adverse effect on normal and efficient longshoring operations in the Port." 319 F.Supp. at 743.

■ In turning its attention to the Government's proposal that the gang system be abruptly abandoned and that a daily shape-up system be instituted the court analyzed the evidence and stated its findings and conclusions. The court compared the longshoring work at the Port of Baltimore and at other ports, New York, Philadelphia, Galveston, Houston and Jacksonville, the nature of the cargoes handled at some of the various ports, the number of accidents per one million man hours worked, the favorable accident rate at Baltimore under the gang system where more dangerous cargoes are handled (large shipments of steel and steel products) as against the less favorable accident rate at other ports under the daily shape-up system where less dangerous cargoes are handled (grain, cotton, etc.). Based upon evidence discussed by the court, findings were made which are supported by the record. As noted, the few witnesses who favored the daily shape-up system were from other ports and were not generally familiar with the cargoes usually handled in Baltimore or the conditions at that port.

The court pointed out that a gang of longshoremen operates as a team; that the skill and efficiency of a particular gang depends in large measure on the teamwork of its members, developed by working together over a period of years; that the evidence discloses that a daily shape-up system would be inefficient, would increase safety hazards and would

decrease productivity of the workers; that almost all of the experienced longshoremen who testified, both white and Negro, opposed abolition of the gang system; that the daily shape-up system in general has not been satisfactory elsewhere in those few ports where it is used; that in recent years the productivity of longshoremen in the Port of Baltimore has increased while that of similar workers in other ports where new gangs are formed each morning has decreased.

While refusing to order the immediate and abrupt abolition of the gang system the court indicated that important modifications are necessary:

"To hold that the gang system should not be discontinued is not to imply that in the future it should operate in all respects as it has in the past. On the contrary, important modifications are necessary if the present system is to operate in such a way that members of the merged local will not be denied equal employment opportunities. The decree in this case should require the defendants to take affirmative action to insure that the continued operation of the gang system does not deprive any such member of employment opportunities or limit such opportunities.

"In particular, the new local should take steps to insure that available work is apportioned equally between existing white gangs and Negro gangs. Furthermore, when an extra man is needed or when an opening occurs in a particular gang because of sickness, retirement, death or for any other reason, such gang may not discriminate in selecting a replacement and may not choose a new white or Negro member merely because other members of the gang are white or Negro. It is clear that the present replacement policy, based as it has been on racial considerations, is discriminatory and unlawful. An opening in a gang should be filled either temporarily or permanently on the basis of seniority or other objective factors and not on the basis of race. If union rules required

that an opening in a gang should be offered to a qualified white or Negro longshoreman with the greatest seniority before being offered to a similarly qualified individual with lesser seniority, most of the existing gangs would before long have both Negro and white members." 319 F. Supp. at 745, 746.

In footnote 9 of his opinion Judge Butzner undertakes a comparison of accident rates in various ports where the daily shape-up system has been in use in recent years and reaches the conclusion that the accident rate has been reduced. At the same time he recognizes that the shape-up cannot be isolated as the only reason for the decline in accident rates and that other undisclosed factors may have played an important role. But the district judge found from the evidence that the average accident rate for the last four years in each of the ports of Jacksonville, Galveston and Houston which have instituted the daily shape-up system is higher than the accident rate in Baltimore under the gang system even though more dangerous cargoes are handled in Baltimore. In fact, the court below pointed to Galveston as having one of the highest accident rates in the country, the average rate over the last four years being 118.1 per one million man hours worked as against the amazingly much lower rate of 76.2 over the same period in Baltimore.

The evidence disclosed also, as found by the court, that the longshoremen in Jacksonville and Galveston have complained about the amount of wasted time spent each morning attending the shape-up. A man is not paid until he actually starts work at 8 a. m. each morning, yet he must report to the hiring hall around 6:30 a. m. and wait without compensation "for the gangs to be formed."

The court noted the Government's claim of unequal employment opportunities in the past for the Negro longshoremen but he found a reason for the disparity and discussed the solution to the problem and the anticipated total elimination of the disparity.

In its opinion the court observed that for the reasons stated the gang system would not be discontinued in the Port of Baltimore but that the decree entered should contain provisions requiring modification of the gang system in the manner stated in the opinion and should further provide that jurisdiction be retained by the court for the purpose of entering any additional order that is feasible and necessary to insure equal employment opportunities without regard to race for all members of the defendant unions in the Port of Baltimore. It is obvious that, by retaining jurisdiction, the court below was prepared to enter such orders as might be necessary if, after a trial period, it should appear that additional action is necessary to further implement the court's stated objectives. The decree providing for the retention of jurisdiction is most appropriate in the circumstances.

ALBERT V. BRYAN, Circuit Judge (dissenting):

I do not join the majority in holding that locals 829 and 858 should be merged. I think all objection to their separate existence is removed by dissolution of separate hiring halls. A common source of labor controlled by an integrated hiring system means that there will be no inequality, based on race, in the opportunity for employment.