**UNITED STATES of America, Plaintiff,**

v.

**INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, Atlantic Coast District, International Longshoremen's Association, and Locals 829 and 858, I. L. A., Baltimore, Maryland, Defendants.**

**Civ. No. 20688–H.**

United States District Court,
D. Maryland.

Dec. 3, 1970.

John N. Mitchell, Atty. Gen., Jerris Leonard, Asst. Atty. Gen., Andrew J. Ruzicho and John W. Davis, Washington, D. C., and George Beall, U. S. Atty., Baltimore, Md., for plaintiff.

Julius Miller, Thomas W. Gleason and Gleason & Miller, New York City, and O'Connor & Preston, Baltimore, Md., for defendants.

HARVEY, District Judge:

In this civil action, the United States (the "Government") is seeking injunctive relief against various labor organizations because of alleged violations of

Title VII of the Civil Rights Act of 1964 (the "Act"). Named as defendants are Locals 829 and 858 of the International Longshoremen's Association, as well as the International Longshoremen's Association itself (the "ILA") and the Atlantic Coast District of the ILA (the "District").

The Government claims that Locals 829 and 858 have violated and continue to violate § 703(c) of the Act, 42 U.S.C. § 2000e–2(c), which provides as follows:

"(c) It shall be an unlawful employment practice for a labor organization—

(1) to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin;

(2) to limit, segregate, or classify its membership, or to classify or fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race, color, religion, sex, or national origin; or

(3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section."

It is alleged in the complaint that defendants have engaged in and are engaging in a pattern and practice of discrimination against persons on account of their race in the operation of their labor organizations in the State of Maryland. The Government seeks to enjoin the defendants from engaging in any employment practice which discriminates against any person on account of race. In particular, this Court is asked to en-

ter a decree (1) merging Locals 829 and 858 into a single union; (2) requiring that these Locals operate a single hiring hall; and (3) requiring that the gang system for supplying longshoremen to employers in the Port of Baltimore be discontinued and that gangs as presently constituted be disbanded and reorganized on a non-racial basis.

The ILA itself and the District have been joined as parties because no merger of the two Locals would be possible in the absence of an order requiring appropriate action by the parent organizations as well.[1] The Executive Council of the ILA has the power under its constitution to issue and revoke charters of local unions and to order the consolidation of two or more locals. It is the responsibility of the District to recommend to the parent organization whether a local should be chartered.

The defendants assert that neither the two Locals nor the other defendants have violated the Act and further take the position that if any violations have been proved, the Government's proposed relief is not feasible. The defendants have heretofore sought to file an amendment to their answer contending that a court-ordered merger of the two Locals would violate their members' right of freedom of association under the First Amendment to the United States Constitution. A motion to strike defendants' proposed amendment under Rule 12(f) of the Federal Rules of Civil Procedure has heretofore been granted by this Court after a hearing, on the ground that the defense raised by the amendment was insufficient as a matter of law.[2]

### Facts

The parties have stipulated to most of the background facts, and numerous sta-

---

1. The defendant ILA is the parent organization which organizes and charters local unions engaged in the loading and unloading of ships in the United States and Canada, as well as local unions in related occupations. The defendant District is a division of the ILA with juris-

diction over local ports along the Atlantic Coast north of Cape Hatteras, North Carolina.

2. An Order to this effect was entered by the Court in this case on July 31, 1970.

tistical exhibits were admitted in evidence at the trial without objection. Local 829 and Local 858 represent longshoremen who load and unload ships in the Port of Baltimore. Local 829 was chartered in 1913 and from the time that it was formed has been composed almost entirely of white persons. At the present time there are approximately 1155 active members of Local 829, and since 1950 there have been about 4 Negro members. Since 1960, Local 829 has admitted to membership approximately 757 persons, all of whom have been white.

Local 858 was chartered in 1914. At all times since it was formed, Local 858 has been composed almost entirely of Negro persons. At the present time there are approximately 1226 active members of Local 858, of whom approximately 5 are white. Since 1964, Local 858 has admitted 263 members, all of whom were Negro except 2.

Locals 829 and 858 are the general cargo locals for the Port of Baltimore. They work under the same collective bargaining agreement, for the same companies, on the same ships, and occasionally in the same hatches at the same times. It is undisputed therefore that the members of both Locals do the same kind of work. The parties to the collective bargaining agreement which covers longshoring operations in Baltimore are the ILA, the District, the Locals and the Steamship Trade Association of Baltimore (the "STA"). The Locals bargain collectively on behalf of all longshoremen in the jurisdiction, and under the terms of the collective bargaining agreement the Locals refer members to job opportunities through their hiring halls. The STA represents all the stevedoring companies in the area who use the referral services of the hiring halls of the two Locals, and the STA is responsible for paying annual vacation benefits to the members of both local unions. A separate hiring hall is maintained by each Local.

In the Port of Baltimore, labor is supplied to stevedoring companies for the purpose of loading and unloading vessels in accordance with the so-called "gang system". Most ports along the Atlantic and Gulf Coasts use a similar system, although a few ports use a daily shape-up system based exclusively on seniority. Under the gang system, the leader or gang carrier forms a group of some 15 to 20 regular members. A normal gang consists of 8 men in the hold, 2 winch drivers, 4 deckmen, and a gang carrier. Gangs from both Locals 829 and 858 are referred to the stevedoring companies as a result of telephone calls to the hiring halls during the afternoon of the day before the men are needed for the work. Many gangs are assigned to particular employers and are regularly called by such employer when work is available. If more gangs are needed on a particular day in addition to those regularly assigned, the employer will specifically request another gang or will accept one from those available.

A new member of a Local first obtains work with a particular gang as an extra man or as a replacement whenever men are needed to increase the size of a gang or to fill a vacancy within the gang. When a regular vacancy occurs in a gang because of death, retirement or for any other reason, the gang carrier is the individual who selects the new member. A new member of a gang normally begins by performing less desirable work in the hold of a ship. There is an informal line of progression whereby such a member may work up to the more desirable top-side jobs. If a gang carrier leaves, the gang itself elects a new leader who is usually a member of the gang.

Local 829 supervises 30 gangs operating in the Port of Baltimore. All gangs under the supervision of Local 829 are composed solely of white longshoremen, with two exceptions. One of these gangs is composed solely of Negroes and includes members of both Local 829 and Local 858. One other is known as the "checkerboard" gang in that it includes members of both races from both locals. Local 858 has approximately 47

gangs operating in the Port, and all 47 are composed entirely of Negro long-shoremen.

Most of the stevedoring companies in the City of Baltimore use both white and Negro gangs and use approximately as many Negro as white gangs.[3] A few use only white or only Negro gangs.[4] There is no difference in skill and ability between white gangs and Negro gangs handling the same type of cargo.

## Applicability of the Act

The Government seeks in this action to prove that Locals 829 and 858 have violated all three sub-sections of Section 703(c) of the Act. It is claimed that these two Locals have excluded from their membership individuals because of their race in violation of subsection (c) (1), that they have segregated or classified their membership in violation of subsection (c) (2), and that they have caused employers to discriminate against individual union members in violation of subsection (c) (3).

■ It is, of course, not necessary for this Court to find violations of all three of these subsections if the Government is to be entitled to relief. Only one need be proved. For the reasons stated herein, this Court finds from the evidence in this case that the defendant Locals have violated Section 703(c) (2) of the Act. It is therefore unnecessary to consider whether the facts further show violations of subsections (1) and (3).

It is clear from the stipulations and evidence that Locals 829 and 858 are segregated locals. Local 829 was chartered and has always been maintained as a white local with only a token number of Negro members. Since 1914 it has been known as the "white local", and most Negro longshoremen have therefore refrained from applying for membership to it.[5] Conversely, Local 858 was chartered as and has been maintained and known as a Negro local.[6] Only one of the 77 gangs operated under the supervision of these two Locals in the Port of Baltimore includes both white and Negro members of the gang.

■ This Court concludes that the maintenance of locals whose membership is segregated by race is a *per se* violation of Section 703(c) (2) of the Act. The defendants contend that the Government has not proved that segregation or racial classification of the membership of these two locals has deprived individuals of equal employment opportunites. But it is not necessary for the Court in this case to make specific findings to this effect under Section 703(c) (2). Subsection (c) (2) applies not only to the segregation or classification of the membership of a union which would deprive an individual of employment opportunities because of race but also to such segregation or classification which would *"tend to deprive* any individual of employment opportunities * * * because of such individual's race * * *." (Emphasis added.)

■ The maintenance of separate locals for Negroes and whites performing

---

3. For example, Jarka regularly employs seven gangs from Local 829 and seven from Local 858; Nacirema two from 829 and three from 858, and Atlantic and Gulf five from 829 and four from 858.

4. For example, Rukert regularly employs three gangs from Local 858 and none from Local 829 while U. S. Lines regularly uses four from 829 and none from 858.

5. Before a Negro can join Local 829, it is necessary that he have a sponsor who is a member of that Local (*viz.* a white sponsor). In 1967, 47 Negro and 15 white

members of Local 1429, the freight handlers' Local in the Port, were required to transfer to either Local 829 or Local 858. All the Negroes transferred to Local 858 and all the whites transferred to Local 829.

6. Mr. Thomas W. Gleason, President of the ILA, testified by way of deposition that Negro locals were originally chartered by the ILA to protect Negro members so that they would receive a fair share of the work.

the same duties in the same geographical area in itself would tend to deprive individual members of equal employment opportunities. As firmly established in Brown v. Board of Education, 347 U.S. 483, 494, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the sanctioning of racially separate groupings in schools is inherently discriminatory, and this principle applies with equal force to cases such as the pending one where equal employment opportunities are involved. The doctrine of "separate but equal" has long since been laid to rest in other areas. Mayor and City Council of Baltimore City v. Dawson, 350 U.S. 877, 76 S.Ct. 133, 100 L.Ed. 774 (1955), affirming 220 F.2d 386 (4th Cir. 1955) (racial segregation of public beaches and bathhouses); Johnson v. Virginia, 373 U.S. 61, 83 S.Ct. 1053, 10 L.Ed.2d 195 (1963), (separate seats in a courtroom); Christian v. Jemison, 303 F.2d 52 (5th Cir. 1962) (separate seating in public transportation); Turner v. Randolph, 195 F.Supp. 677 (W.D.Tenn.1961) (separate washrooms). No valid reason has been advanced by defendants for this doctrine's exhumation to justify the maintenance of racially segregated unions whose members work side by side as longshoremen.[7]

In Hicks v. Crown Zellerbach Corporation, 310 F.Supp. 536 (E.D.La.1970), the Court likewise found that the defendant International's maintenance of separate local unions for white and Negro employees was in violation of Section 703(c) (2) of the Act. In an earlier case in that District, the same judge reached the same conclusion as to the legality of segregated local unions in a case involving alleged violations of Section 703(a) of the Act. United States v. Local 189, United Paper Makers and Paper Workers, 301 F.Supp. 906 (E.D.La. 1969), affirmed 416 F.2d 980 (5th Cir. 1969).[8]

For the reasons stated, this Court concludes that by segregating their membership by race, Locals 829 and 858 have violated Section 703(c) (2) of the Civil Rights Act of 1964 and that the Government is entitled to appropriate injunctive relief.

*Injunctive Relief*

More difficult than the question whether defendants have violated the Act in this case is that concerning the precise nature and extent of the relief to which the Government is entitled under Section 706(g) of the Act, 42 U.S.C. § 2000e–5(g)[9]. To the extent that this Court finds present effects of past discrimination, it should promptly formulate effective affirmative injunctive relief. United States by Clark v. Dillon Supply Co., 429 F.2d 800, 804 (4th Cir. 1970). Specifically, the Government has asked this Court to order the merging of the two Locals, to order that defendants maintain only a single hiring hall and to order the discontinuance in the Port of the present gang system for referring longshoremen to employers for work.[10]

In opposing the relief sought by the Government in this case, defendants con-

---

7. In this case, some white and some Negro longshoremen testified that they were opposed to the merger of their Locals. But nothing in the Act suggests that the maintenance of segregated locals, tending to deprive individuals of employment opportunities is legally permissible merely because some union members of both races favor such segregation. See Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5, 19 (1958).

8. Furthermore, the National Labor Relations Board has held that the maintenance of separate segregated locals is grounds for de-certification. Pioneer Bus Company, Inc. and Transport Workers' Union, 140 N.L.R.B. 54 (1962); Hughes Tool Company, 147 N.L.R.B. 1573 (1964).

9. Section 706(g) provides that a court may enjoin a defendant from engaging in an unlawful employment practice and may "order such affirmative action as may be appropriate * * *."

10. Under the system proposed by the Government, the existing gangs would be disbanded, and a new gang would be "shaped-up" or formed each time a ship arrived in the Port for loading or unloading.

tend that what the Government has proposed is not feasible in view of the facts and circumstances developed at the trial concerning longshoring operations in the Port of Baltimore. The Government concedes that appropriate injunctive relief must not only be designed to accomplish the objectives of the Act but must also be feasible insofar as the particular employment practice in the industry is concerned. The question of the feasibility of injunctive relief under the Act was discussed by the Fifth Circuit Court of Appeals in that Court's opinion in Local 189, United Paper Makers and Paper Workers v. United States, 416 F.2d 980 (5th Cir. 1969). At page 989, the Court noted that when an employer or union has discriminated in the past, present policies which continue discriminatory effects must yield "unless there is an overriding legitimate, non-racial business purpose." At page 994, the Court further said the following:

"When an employer adopts a system that necessarily carries forward the incidents of discrimination into the present, his practice constitutes on-going discrimination, unless the incidents are limited to those that safety and efficiency require."

In Quarles v. Philip Morris, Incorporated, 279 F.Supp. 505, 518 (E.D.Va. 1968), it was also noted that business necessity is a factor to be considered by the Court in a case of this sort.

Considerations of safety and efficiency, as well as other non-racial business purposes, are therefore pertinent in this case. In deciding upon appropriate injunctive relief here, this Court is faced with a balancing process. On the one hand, the Court must consider the effects of the many years of racial segregation of the members of Locals 829 and 858, insofar as such practice has or may have tended to deprive individual union members of employment opportunities. Against these considerations must be weighed the effects that a decree reor-ganizing longshoring operations might have on the entire industry in the Port of Baltimore. Far-reaching relief which would adversely affect productivity and efficiency to such an extent as to discourage the use of the Port by shipping interests would reduce the availability of the very employment which is sought to be protected. What is required here is a decree which would eliminate, as far as possible, past discriminatory practices and yet would have a minimal adverse effect on normal and efficient longshoring operations in the Port.

The defendants here contend that considerations of efficiency, productivity and safety should impel this Court to decline to grant any of the specific relief sought by the Government in this case. With reference to the merging of the Locals and the hiring halls, it is clear that the defendants' arguments are without merit. Indeed, the merging of these Locals and the maintenance of but one hiring hall would add to the efficiency of the procedures employed by both the union and the employers. No longer would it be necessary for employers to bargain with the officers and representatives of two different locals. Nor would telephone calls have to be placed to two separate hiring halls to secure longshoremen to work a particular job. The testimony indicates that some employers purposely have attempted to hire as many Negroes as whites. With but one local charged with the duty of supplying longshoremen on a non-discriminatory basis, the stevedoring companies will not hereafter have to spend time and effort attempting to achieve a racial balance of their employees.

The Order to be signed by this Court should therefore include provisions requiring the merger of Locals 829 and 858 into a single local, such merger to be accomplished in the manner and within the time fixed by the Order.[11] Whether one Local should be merged into the other as was required in Hicks

---

11. As there are almost as many active members of Local 829 as of Local 858, the merged local will have approximately as many Negro as white members.

v. Crown Zellerbach Corporation, *supra*, or whether both should be merged into a newly created local will be left for further determination by the Court when a final Order is submitted. In addition, such Order should provide for the maintenance by the one remaining local of but a single hiring hall.

There is considerably more substance to the defendants' arguments that abolition of the gang system of hiring would not be feasible in the Port of Baltimore. Not only has the gang system been used in Baltimore for over 30 years, but it is also clear that most other large ports along the Atlantic Coast operate under a similar system.[12] The evidence discloses that a gang of longshoremen operates as a team. The skill and efficiency of a particular gang depends in large measure on the teamwork of its members, developed by working together over a period of years. As would be true if a football or other sports team adopted such a practice before every game, the complete reshuffling of the regular members of a gang and the daily replacement of such members with other individuals who had never previously worked together would quite clearly have an adverse effect on the performance of the gang as a whole.

The Government proposes that a daily shape-up be undertaken with gangs being organized each morning solely on the basis of seniority. The evidence in this case discloses that such a system would be inefficient, would increase safety hazards and would decrease the productivity of the workers. Almost all the experienced longshoremen who testified in this case, both white and Negro, opposed abolition of the gang system. Those few witnesses who supported the daily shape-up system were from other ports and were not generally familiar with the cargoes usually handled in Baltimore or with the conditions at this Port. In weighing the feasibility of the relief proposed by the Government against the degree of discrimination proved in this case, this Court finds that the disbanding of the existing gangs and the abolition of the gang system would not be appropriate relief here because it would decrease the efficiency of and create hazardous conditions for the work being performed by longshoremen in the Port of Baltimore.

The daily shape-up system has in general not been successful elsewhere and has undoubtedly contributed to higher accident rates in those few ports where it is used. Jacksonville, which has had a daily shape-up system for a number of years, has a much higher accident rate than does Baltimore. Figures based on the number of accidents per one million man hours worked show Jacksonville's average for the past 4 years to be 91.8 as compared with 76.2 for Baltimore. The Negro President of a Jacksonville Negro local testified that members of his union had complained to him on many occasions about the hiring system in that port and that he favored a gang system. In particular, longshoremen in Jacksonville have complained about the amount of wasted time spent each morning attending the shape-up. A man is not paid until he actually starts work at 8:00 A.M. each morning. Yet he must report to the hiring hall around 6:30 A. M. and wait without compensation for the gangs to be formed.

Similar complaints have been voiced by longshoremen in Galveston, which adopted a daily shape-up system in 1966. In the past four years, Galveston has had one of the highest accident rates in the country, its average accident rate for that period being 118.1.

In support of its position, the Government points to the Port of Houston which operates under a daily shape-up system, and the Government claims that the Houston figures show that a shape-up system can be as safe as a gang system. However, the evidence discloses that safer cargoes are handled at Houston than at Baltimore, including a much larger amount of grain, cotton and piece

12. New York and Philadelphia operate under a gang system.

work and much less steel. Large tonnages of steel products are regularly loaded and unloaded in the Port of Baltimore, longshoring work which might be expected to result in more accidents than in Houston. Even though more dangerous cargoes are handled in Baltimore than in Houston, Baltimore's safety rate is actually slightly less than that of Houston, 76.2 as compared to 77.4, averaged over the past four years.

Witness after witness, notably those who regularly handle cargoes such as steel rails and other steel products requiring a high degree of cooperation between members of the gang, testified that they would not for safety reasons work as a part of a gang newly formed each morning for each particular job.[13] In recent years, the productivity of longshoremen in the Port of Baltimore has increased while that of similar workers in other ports has gone down. From the evidence in this case, this Court finds that if the daily shape-up system were put into effect in Baltimore, the productivity of longshoremen in this Port would be adversely affected.

The Government contends that the evidence here establishes that Negro longshoremen uniformly work the so-called "dirty" cargoes (fishmeal, ore and the like) while whites work the cleaner cargoes. It appears that although some white gangs do load and unload dirty cargoes, Negro gangs handle much more of this kind of work. However, the defendants cannot be held responsible for maintaining such a practice.[14] Longshoremen have the right to decline to work any job that is offered to them. Top-skilled gangs in both Local 829 and Local 858 regularly refuse to work dirty cargoes. Some Negro gangs, regularly assigned to stevedoring companies which deal only in dirty cargoes, are willing to undertake this work. A daily shape-up

would not necessarily result in more whites being assigned to this type of work, since whites would still retain the right to refuse a particular job as they have in the past and as have some Negroes also.

To hold that the gang system should not be discontinued is not to imply that in the future it should operate in all respects as it has in the past. On the contrary, important modifications are necessary if the present system is to operate in such a way that members of the merged local will not be denied equal employment opportunities. The decree in this case should require the defendants to take affirmative action to insure that the continued operation of the gang system does not deprive any such member of employment opportunities or limit such opportunities.

In particular, the new local should take steps to insure that available work is apportioned equally between existing white gangs and Negro gangs. Furthermore, when an extra man is needed or when an opening occurs in a particular gang because of sickness, retirement, death or for any other reason, such gang may not discriminate in selecting a replacement and may not choose a new white or Negro member merely because other members of the gang are white or Negro. It is clear that the present replacement policy, based as it has been on racial considerations, is discriminatory and unlawful. An opening in a gang should be filled either temporarily or permanently on the basis of seniority or other objective factors and not on the basis of race. If union rules required that an opening in a gang should be offered to a qualified white or Negro longshoreman with the greatest seniority before being offered to a similarly qualified individual with lesser seniority, most of the existing gangs would be-

13. The Negro President of Local 858 testified that the dismantling of existing gangs would "break up the Port."

14. The stevedoring companies have not been made parties to this action. Even if the companies were parties here and were ordered to hire white gangs to work dirty cargoes, the white gangs would still have the right to decline to do this work.

fore long have both Negro and white members.

To insure that equal employment opportunities are not denied to individual union members because of race, the new local should undertake to adopt a seniority system which is fair and objective as to all its members.[15] Following approval of a fair and objective seniority plan by union members, the new local should seek its implementation by means of collective bargaining with the STA and by inclusion of such a plan in the collective bargaining agreement.

In addition, the defendants should take affirmative steps to require that the stevedoring companies employ mechanics, gearmen and foremen on the basis of ability and seniority rather than because of race.[16] The evidence discloses that Negroes have been denied equal employment opportunities because qualified Negroes have not been employed by the stevedoring companies in these preferred capacities as often as whites. At the present time, there are about 70 gearmen and mechanics who are regularly employed by the stevedoring companies of which only about 10 are Negro members of Local 858. The defendants contend that such employment is undertaken directly by the companies and that the Locals have no control over whom the companies select. There is no apparent reason, however, why the new local cannot and should not insist on a provision in its collective bargaining agreement requiring the companies to offer such employment to all union members qualified by experience for these preferred positions without regard to their race.

In claiming that Negroes have been deprived of employment opportunities as a result of a pattern or practice of discrimination undertaken by the defendants, the Government introduced evidence to show that white longshoremen have worked more hours than Negro longshoremen in recent years in the Port of Baltimore. However, the proof further shows that the principal reason for this disparity is that until recently only a few Negroes have been hired by the stevedoring companies as mechanics, gearmen and foremen.[17] Within the past few years, Local 858 has taken steps to attempt to rectify this imbalance by insisting that the companies hire more Negroes. The success of such efforts is indicated by the figures in evidence showing that the disparity in hours worked between white and Negro longshoremen has been decreasing materially in recent years. In the contract year 1966–67, white longshoremen on the average worked 335 more hours per man than did Negro longshoremen. In the contract year 1967–68, this figure was 241 more hours; in 1968–69, it had dropped to 147 more hours and last year it was 120 more hours. With a merged local insisting that these preferred jobs be given to qualified Negroes as well as to qualified whites, presumably the disparity will soon be entirely eliminated.

For the reasons stated, this Court will not order that the gang system be discontinued in the Port of Baltimore. However, the decree to be entered in this case

15. Indeed, the International has encouraged all its locals to adopt a seniority system. Furthermore, the evidence discloses that Locals 829 and 858 have already discussed a seniority system for inclusion in the collective bargaining agreement and are close to agreement on the details of such a system.

16. These individuals are union members who are not members of gangs but who are usually full-time employees of the companies.

17. Defendants' statistics show that when the hours worked by gangs are totalled, the Local 858 gangs show considerably more hours worked than do the Local 829 gangs for each contract year. Plaintiff's figures, which are broken down by individual white and individual Negro longshoremen, show that whites worked on the average more per year. The difference undoubtedly is made up by the mechanics, gearmen and foremen who are not members of gangs but who are members of the Locals.

should require merger of the unions and the maintenance of but a single hiring hall. It should also contain provisions requiring modification of the gang system in the manner stated in this opinion. The decree should further provide that this Court will retain jurisdiction for the purpose of entering any additional order that is feasible and necessary to insure equal employment opportunities without regard to race for all members of the defendant unions in the Port of Baltimore.

This Court's findings of fact and conclusions of law under Rule 52(a) of the Federal Rules of Civil Procedure are embodied in the foregoing opinion, whether or not expressly so characterized.

Counsel are directed to consult and thereafter prepare and submit to the Court an appropriate decree prepared in conformity with the findings and conclusions contained in this opinion. If necessary, a further hearing will be held concerning the form of such decree.