**Theato WILBURN**
**and**
**Harry Young, Plaintiffs,**

**v.**

**STEAMSHIP TRADE ASSOCIATION OF BALTIMORE, INC., et al.,**
**Defendants.**

**Civ. No. 71–1368–H.**

United States District Court,
D. Maryland.

May 14, 1974.

Whitworth Stokes and Boasberg, Granat & Kass, Washington, D. C., for plaintiffs.

Barrett W. Freedlander and Niles, Barton & Wilmer, Baltimore, Md., for defendants Steamship Trade Assn. of Baltimore, Inc. and Pension Bd. and Bd. of Trustees.

Anthony A. Abato, Jr. and Bracken & Abato, Baltimore, Md., for defendants International Longshoremen's Assn. and Pension Bd. and Bd. of Trustees.

ALEXANDER HARVEY, II, District Judge:

This suit is one of several civil actions[1] filed in this District in the wake of this Court's decision in United States v. International Longshoremen's Association, 319 F.Supp. 737 (D.Md.1970), aff'd, 460 F.2d 497 (4th Cir. 1972), cert. den., 409 U.S. 1007, 93 S.Ct. 439, 34 L. Ed.2d 300 (1972). Two retired, black longshoremen here seek damages, a declaratory judgment and injunctive relief which would increase the amount of the pensions presently being paid to them. Named as defendants in this action are International Longshoremen's Association (the "ILA"), Steamship Trade Association of Baltimore, Inc. (the "STA") and the Pension Board and Board of Trustees of the STA–ILA Pension Trust Fund (the "Pension Board").[2]

The defendant ILA is a national labor organization which organizes and charters local unions of employees engaged in the loading and unloading of ships in the United States and Canada. The STA represents stevedoring companies in the Port of Baltimore and bargains collectively with the ILA locals on behalf of its member companies. The Pension Board is a separate entity created by agreement of the other two parties to administer the Pension Plan established by them for retired longshoremen in the Port.

In Count 1 of the amended complaint, it is alleged that while plaintiff Wilburn was working in the Port of Baltimore as a longshoreman, he was denied equal employment opportunities because of his race and that as a result of such alleged racial discrimination, he has been denied increased pension benefits by the defendants. Count 1 alleges violations of 42 U.S.C. § 1981 and 42 U.S.C. § 2000e et seq. Count 2 is based on § 301 of the National Labor Relations Act, 29 U.S.C. § 141 et seq., and alleges that the ILA has violated its duty to fairly represent plaintiff Wilburn as a union member and that the other defendants knowingly participated in such violation. By later amendment, plaintiff Wilburn added a third Count which asserted a claim under 29 U.S.C. § 186(c) to the effect that the eligibility requirements of defendants' Pension Plan as applied to the plaintiff were arbitrary and capricious.

Following various pre-trial proceedings in this case, another longshoreman named Harry Young was permitted to intervene as a party plaintiff, and he asserts the same claims against the defendants as does the plaintiff Wilburn.

1. See also McFadden v. Baltimore Steamship Trade Association, 352 F.Supp. 403 (D. Md.1973), aff'd, 483 F.2d 452 (4th Cir. 1973).

2. The correct name of the third defendant is "Pension Board of the Steamship Trade Association of Baltimore, Inc.–International Longshoremen's Association Pension Trust Fund." By agreement of the parties, this entity has been sued as "Pension Board and Board of Trustees."

Plaintiff Wilburn seeks damages in the amount of $4200 as additional pension benefits payable to him since he retired, and plaintiff Young seeks similar damages in the amount of $2550. Both plaintiffs seek a declaratory judgment and injunctive relief which would increase the amount of the pension benefits to be hereafter paid to them.

### Facts

As a result of collective bargaining between the ILA on behalf of its member locals and the STA on behalf of its employer members, a Pension Plan for the benefit of longshoremen working in the Port of Baltimore was first established in 1950.[3] A written instrument was executed, and a Pension Board appointed to act as Trustees and administer the Plan. Three members of the Pension Board were to be elected by the employer members of STA and eight by the ILA. At any meeting, the STA members were entitled collectively to cast three votes and the ILA members collectively three votes. The Trustees were empowered to make such changes, modifications and amendments as deemed desirable from time to time. The Plan had been approved by the Internal Revenue Service as a qualified trust pursuant to applicable provisions of the Internal Revenue Code of 1954, 26 U.S.C. § 401, and amendments to the Plan were subject to favorable tax rulings.

From the outset, employees were not required to contribute to the Fund. The Pension Plan was originally funded solely by contributions made by employers based on total man hours worked, but more recently contributions from sugar and container royalties have also been added to the Fund. From time to time, as the result of collective bargaining be-

tween the ILA and the STA, the amounts of the employers' contributions have been increased.[4]

Periodically, the Plan itself has been amended so that the benefits might in one way or another reflect these increased contributions. Before April 1, 1969, there was only one level of benefits payable to a normal retiree, and a longshoreman who qualified for normal retirement between January 1, 1966 and April 1, 1969 was entitled to receive a monthly benefit of $200. As of October 1, 1968, the Thirteenth Amendment to the Pension Plan was adopted, which established two levels of benefits, effective April 1, 1969. The standard benefits remained at $200, and for those who met more stringent eligibility requirements, maximum benefits of $300 were provided. Effective January 1, 1972, as a result of the Sixteenth Amendment to the Plan, regular benefits were increased to $250 per month, maximum benefits for those who had met the more stringent eligibility requirements but who had retired between April 1, 1969 and December 31, 1971 were increased to $350 per month, and maximum benefits for those who met such requirements and who would retire after January 1, 1972 were fixed at $400 per month.[5]

The provisions of the Pension Plan, as amended, are quite detailed and cover various other types of pension benefits besides these regular and maximum payments for normal retirees, including early retirement, disability, and widows' benefits. Eligibility requirements for all benefits are spelled out in the amended Plan with some particularity. Insofar as the claims asserted by the plaintiffs in this case are concerned, the amended Plan provides that to qualify for regular monthly benefits, a retiring longshore-

---

3. The date that the Plan was adopted was December 20, 1950.

4. The amount initially contributed by employers in the 1951 contract year was $.05 per hour worked. This amount has been increased so that in the contract year 1974,

the employers contribute $1.22 per hour worked.

5. No claim is made in this case that the Thirteenth or Sixteenth Amendments were intended to discriminate against plaintiffs or other black longshoremen because of their race.

man must meet the following eligibility requirements:

1. He must be 62 years of age before the first of the month in which he retires;

2. He must have been employed in the industry for a continuous period of at least 25 years ending with the contract year prior to his application;

3. He must have worked at least 400 hours in a calendar or contract year [6] before his continuous employment in the industry shall be deemed to have commenced;

4. He must have worked at least 400 hours in each of 20 of the 25 years ending with the contract year prior to his application; and

5. He must have worked 17,500 hours or more during the 25 qualifying years.

In order to qualify for maximum monthly benefits, a retiring longshoreman must meet more stringent eligibility requirements. Besides satisfying all of the requirements listed above, he must in addition have worked at least 700 hours in each of 20 of the 25 years ending with the contract year prior to his application, and he would not be deemed to have commenced his continuous employment in the industry until he had worked at least 700 hours in a calendar or contract year. Both plaintiffs have satisfied the requirements for regular benefits but do not qualify for maximum benefits.

A long-time member of Local 858 of the ILA, plaintiff Wilburn first worked as a longshoreman in the Port of Baltimore in 1945. In 1970, having reached the age of 69, he elected to retire. His retirement became effective on November 1, 1970, at which time he became eligible to receive the regular monthly benefits of $200. As a result of the Sixteenth Amendment to the Pension Plan, his pension benefits were increased on January 1, 1972 to $250 per month, and Wilburn has been receiving this amount ever since.

The total annual hours worked by plaintiff Wilburn until the time of his retirement are as follows:

| YEAR | TOTAL HOURS |
| --- | --- |
| 1945/1946 | 873 |
| 1946/1947 | 1,023 |
| 1947/1948 | 618 |
| 1948/1949 | 523 |
| 1949/1950 | 49 |
| 1950/1951 | 551 |
| 1951/1952 | 129 |
| 1952/1953 | 2,069 |
| 1953/1954 | 1,523 |
| 1954/1955 | None |
| 1955/1956 | 872 |
| 1956/1957 | 1,376 |
| 1957/1958 | 660 |
| 1958/1959 | 754 |
| 1959/1960 | 99 |
| 1960/1961 | 461 |
| 1961/1962 | 993 |
| 1962/1963 | 1,029 |
| 1963/1964 | 1,262 |
| 1964/1965 | 1,175 |
| 1965/1966 | 786 |
| 1966/1967 | 462 |
| 1967/1968 | 376 |
| 1968/1969 | 885 |
| 1969/1970 | 728 |

Analysis of these figures indicates that plaintiff Wilburn qualified for regular benefits because he met all eligibility requirements, including having at least 400 hours in each of 20 of the 25 years ending with the contract year prior to his application. However, he did not qualify for maximum benefits because he had worked 700 hours or more in only 14 of such 25 years. To qualify for maximum benefits, he thus needed six additional 700-hour years. Wilburn claims that he was, because of his race, denied the addi-

---

6. After 1945, a contract year rather than a calendar year was used for the recording of hours worked in the industry. The contract year 1946 extended from October 1, 1945 until September 30, 1946, and the same twelve months were used to measure each successive contract year.

tional employment in those six years which would have permitted him to qualify for maximum benefits.

Likewise a member of Local 858 for many years, plaintiff Young first worked as a longshoreman in 1944. In 1972, at age 65, he elected to retire. His retirement became effective on December 1, 1972, at which time he became eligible to receive the regular monthly benefits of $250, and Young has been receiving this amount ever since.

The total annual hours worked by plaintiff Young until the time of his retirement are as follows:

| YEAR | TOTAL HOURS |
| --- | --- |
| 1944 | 1,966 |
| 1945 | 1,001 |
| 1945/1946 | 8 |
| 1946/1947 | None |
| 1947/1948 | None |
| 1948/1949 | 229 |
| 1949/1950 | 800 |
| 1950/1951 | 1,049 |
| 1951/1952 | 1,071 |
| 1952/1953 | 980 |
| 1953/1954 | 800 |
| 1954/1955 | 845 |
| 1955/1956 | 677 |
| 1956/1957 | 1,088 |
| 1957/1958 | 435 |
| 1958/1959 | 468 |
| 1959/1960 | 713 |
| 1960/1961 | 944 |
| 1961/1962 | 1,205 |
| 1962/1963 | 794 |
| 1963/1964 | 1,210 |
| 1964/1965 | 1,213 |
| 1965/1966 | 1,147 |
| 1966/1967 | 907 |
| 1967/1968 | 1,118 |
| 1968/1969 | 1,132 |
| 1969/1970 | 1,163 |
| 1970/1971 | 1,257 |
| 1971/1972 | 829 |

Analysis of these figures indicates that plaintiff Young was not eligible for maximum benefits for a different reason from that of plaintiff Wilburn. The first of 25 years ending with the contract year prior to his application would have been the contract year 1947. However, Young's period of continuous employment could not be calculated as beginning either in the contract year 1947 or in the contract year 1946 because in neither of those two years had Young worked the required 400 hours to qualify for regular benefits nor the required 700 hours to qualify for maximum benefits. Therefore, his period of continuous employment commenced in the calendar year 1945, when he recorded 1,001 hours of work. During the next 25 consecutive work years, he recorded 400 hours or more in 21 of those years, and he thus qualified for regular benefits. However, he had worked 700 hours or more in only 18 of the 25 years and thus did not meet the more stringent requirements. To qualify for maximum benefits, Young needed two additional 700-hour years. Like Wilburn, Young claims that he was, because of his race, denied the additional employment which would have permitted him to qualify for maximum benefits.

### Class Action Allegations

This action was originally filed by the plaintiff Wilburn alone. In his amended complaint, Wilburn sought damages, a declaratory judgment and injunctive relief on his own behalf and, under Rule 23 of the Federal Rules of Civil Procedure, on behalf of an alleged class of retired black longshoremen. Following extensive discovery on both sides, plaintiff Wilburn filed a motion asking that this suit be maintained as a class action. He sought to have the class determined to be all black longshoremen who are members or former members of Local 858 and who are presently receiving retirement benefits under the Thirteenth Amendment to the Plan (some 24 in number, including the plaintiff Wilburn) or under the Sixteenth Amendment to the Plan (some 2 in number). An opposition was filed by defendants to such motion based on various grounds, and defendants further requested that this Court defer ruling on the motion until depositions could be taken of each of the 26 alleged members of the class.

At a hearing on the class action motion, the Court suggested, and both sides

agreed, that an order be entered under Rule 23(c)(1) certifying the suit conditionally as a class action, that a notice be sent to each of the other 25 individuals named besides the plaintiff Wilburn and that, depending upon responses to such notice, the Court would thereafter determine whether the action should proceed finally as a class action or whether the other named retirees should be permitted to intervene.[7] A notice approved by the Court was sent to each of such other 25 retirees, but the only other retired black longshoreman within the provisional class to indicate any interest in this litigation was Harry Young. Six of the individuals to whom notices were sent responded negatively, either requesting that they be excluded from the suit or indicating that they were not interested in making a claim or both. Eighteen did not respond in any way.[8] Retiree Harry Young responded affirmatively, indicating that he wished to make a claim in the pending suit through counsel for plaintiff Wilburn.

At the final pre-trial conference, the Court granted Young the right to intervene and become a party plaintiff in this action and ordered that the case should not proceed as a class action. Plaintiffs have challenged that ruling at the trial.

One of the four prerequisites to the maintenance of a class action is that the class be so numerous that joinder of all members is impracticable. Rule 23(a)(1). It has been held that groups numbering from fifteen to thirty are not so numerous as to satisfy this requirement unless special circumstances make the joinder of all members impracticable. Demarco v. Edens, 390 F.2d 836, 845 (2d Cir. 1968); Glover v. McMurray, 361 F.Supp. 235, 241 (S.D.N.Y.1973); Anderson v. Home Style Stores, Inc., 58 F.R.D. 125 (E.D.Pa.1972). In Goldblum v. Boyd, 60 F.R.D. 421 (W.D.La.1973),

there were 31 in the prospective class, but the Court declined to permit the case to proceed as a class action. In Corporation of Haverford College v. Reeher, 329 F.Supp. 1196, 1199 (E.D.Pa.1971), the Court held that joinder would not be impracticable where a prospective class of 26 was involved.

Mere numbers should not be the only guideline in determining whether an alleged class satisfies the requirements of Rule 23(a)(1). A determination of practicability should depend upon all the circumstances surrounding a case, including whether most of the group live in the same geographical area as the named plaintiff. Demarco v. Edens, *supra* at 845.

Here the maximum number of the class which the plaintiff Wilburn sought to represent was 26. No problems arose concerning joinder of any prospective plaintiff who might wish to intervene, as the names and addresses of every retiree in the provisional class were known, and all lived in the Baltimore City area. Each individual was invited to participate either through Wilburn's counsel or through counsel of his own choice. However, only the plaintiff Young indicated an interest in becoming a party to this action, and he has now been permitted to intervene as a party plaintiff. Under these circumstances, this Court concludes that the members of the alleged class are not so numerous as to make it impracticable to bring them all before the Court. The one individual who expressed an interest in joining as a plaintiff is now a party to the suit. This Court's ruling that this case should not proceed as a class action is re-affirmed.

### The Count 1 claims [9]

Relying on this Court's decision in United States v. International Long-

---

7. The names and addresses of each of the other 25 retirees had been supplied by the Pension Board pursuant to discovery procedures.

8. A stamped envelope self-addressed to the Clerk of this Court had been furnished to all such 25 retirees

9. It is not contended by defendants in this case that the plaintiffs have failed to satisfy the statutory prerequisites for the filing of a suit under 42 U.S.C. § 2000e et seq. Plaintiff Wilburn did file written charges with the EEOC and timely instituted this action after receiving notice of his right to sue.

shoremen's Association, *supra*,[10] plaintiffs contend that they are not receiving maximum retirement benefits under the Pension Plan because employment opportunities were denied them during their working years on account of their race. The history and racial composition of the ILA's two general cargo locals in the Port of Baltimore is discussed in some detail in the Opinion in that case. 319 F.Supp. at 740–741.

The plaintiffs here are both members of Local 858, which at all times since it was formed in 1914 has been composed almost entirely of blacks. Local 829, since it was chartered in 1913, has been composed almost entirely of whites. In the *ILA* case, this Court held that the maintenance of separate locals for blacks and whites performing the same duties in the same geographical area violated § 703(c)(2) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(c)(2). As injunctive relief, it was ordered that Locals 829 and 858 should be merged into a single local and that such one remaining local should maintain a single hiring hall. This Court further ordered that the new local should undertake to adopt a seniority system which was fair and objective for all its members, both black and white, and should take affirmative steps to require that the stevedoring companies in the Port employ mechanics, gearmen and foremen on the basis of ability and seniority rather than on the basis of race. However, this Court declined to order that the gang system of hiring longshoremen should be discontinued in the Port of Baltimore, requiring instead certain modifications of the existing system, as more fully set forth in the Opinion. This Court's rulings on all of these points in the *ILA* case were affirmed by the Fourth Circuit, and the Supreme Court denied certiorari.

Plaintiffs rely on certain statistics which they claim show that black retirees have been denied equal employment opportunities in the longshoring industry over the years. The number of retirees who, like plaintiffs, have qualified for regular benefits of $250 per month but not for maximum benefits of $350 or $400 per month are as follows (listed by Local):

| Local | 829 | – | 0 |
| Local | 858 | – | 26 |
| Local | 921 | – | 4 |
| Local | 953 | – | 1 |
| Local | 1355 | – | 1 |
| Local | 1429 | – | 4 |
| | Total | | 36 |

Although these statistics show that very few white retirees are presently receiving regular benefits,[11] other figures indicate that many more black than white pensioners are receiving maximum benefits. The number of retirees who have qualified for maximum benefits of either $350 per month or of $400 per month are as follows (listed by Local):

| Local | 829 | – | 61 |
| Local | 858 | – | 143 |
| Local | 921 | – | 1 |
| Local | 953 | – | 19 |
| Local | 1355 | – | 4 |
| Local | 1429 | – | 21 |
| | Total | | 249 |

---

10. This case is hereinafter referred to as "the *ILA* case."

11. Local 921 (the grain handlers' local), Local 953 (the checkers' local), Local 1355 (the ship ceilers' local) and Local 1429 (the freight handlers' local) are the other ILA labor organizations in the Port whose members receive benefits from the Pension Fund on retiring. These other locals have both white and black members, but the statistics in evidence do not show the race of the 10 other retirees who, like the 26 black members of Local 858, are receiving only the regular pension benefits. Presumably some of these 10 others are white and others are black.

Other statistics are equally inconclusive. For the eight contract years preceding the filing of this suit, figures relating to the average hours worked of members of Local 829 are as follows:

| Contract Year | Number of Members | Average Hours Worked | Number of Members Who Worked 700 or More Hours | Percentage Who Worked 700 or More Hours |
|---|---|---|---|---|
| 1964 | 1265 | 1478 | 996 | 79% |
| 1965 | 1291 | 1383 | 1048 | 81 |
| 1966 | 1244 | 1407 | 994 | 80 |
| 1967 | 1204 | 1443 | 948 | 79 |
| 1968 | 1213 | 1489 | 964 | 79 |
| 1969 | 1289 | 1349 | 1005 | 78 |
| 1970 | 1269 | 1507 | 961 | 76 |
| 1971 | 1303 | 1477 | 1002 | 77 |

Similar figures for members of Local 858 are as follows:

| Contract Year | Number of Members | Average Hours Worked | Number of Members Who Worked 700 or More Hours | Percentage Who Worked 700 or More Hours |
|---|---|---|---|---|
| 1964 | 1396 | 1218 | 1123 | 80% |
| 1965 | 1424 | 1194 | 1174 | 82 |
| 1966 | 1442 | 1175 | 1103 | 76 |
| 1967 | 1352 | 1108 | 1042 | 77 |
| 1968 | 1291 | 1248 | 1007 | 78 |
| 1969 | 1226 | 1201 | 1024 | 84 |
| 1970 | 1160 | 1351 | 955 | 82 |
| 1971 | 1183 | 1363 | 959 | 81 |

Analysis indicates that the white members of Local 829 in every one of these eight years worked more hours on the average than did the black members of Local 858.[12] On the other hand, in six of these eight years, more black members of Local 858 worked over 700 hours than did white members of Local 829. Moreover, in five of such eight years, a higher percentage of the total membership of Local 858 worked 700 hours or more than of the total membership of Local 829.

In any event, the proof offered at trial in support of the plaintiffs' claims of racial discrimination in this case is subject to the same deficiencies as was that of the plaintiff in McFadden v. Baltimore Steamship Trade Association, *supra.* In *McFadden,* the plaintiff, *inter alia,* claimed that he had been denied employment as a checker because of his race. In support of this claim, he relied on this Court's Opinion in the *ILA* case and on statistics which showed that members of the checkers' local (Local 953) have for years been predominantly white. 352 F. Supp. at 409. Plaintiff argued that white longshoremen, having built up considerably more hours of work as a checker than had blacks, usually were given checkers' jobs because of their seniority and that because of such a system for allocating the work, he had been denied equal employment opportunities by the Union defendants in that case. In commenting on the plaintiff's proof in the *McFadden* case, this Court said the following (352 F.Supp. at 410):

"But plaintiff brings this action solely on his own behalf. This is not

12. Similar findings are discussed in the *ILA* case, 319 F.Supp. at 746.

then either a class action or, as in the *ILA* case, a suit brought by the government attacking an entire system of allocating work between white and black longshoremen. Plaintiff has produced no evidence of specific acts of racial discrimination practiced against him by representatives of the union defendants. He has done no more than prove that he has not worked regularly as a checker and that Local 953 has been predominantly white for years." (Footnote omitted)

In finding the plaintiff's proof in *McFadden* insufficient to support his claim of racial discrimination, this Court relied on the decision of the Fourth Circuit in Stebbins v. State Farm Mutual Automobile Insurance Company (4th Cir. 1972). In that case, the plaintiff had unsuccessfully sought employment as an insurance claims adjuster with several companies and, as proof of discrimination against him, relied on statistical evidence indicating that very few of defendant's claim adjusters were members of minority groups. Finding that the record did not support Stebbins' claims of racial discrimination, the Fourth Circuit said the following:

"Moreover, Congress did not intend by the Civil Rights Act of 1964 to guarantee a job to every person regardless of qualifications. The act does not command that any person be hired merely because he was formerly subject to discrimination or because he is a member of a minority group. Griggs v. Duke Power Co., 401 U.S. 424 [91 S.Ct. 849, 28 L.Ed.2d 158] (1971). Any doubt on this point is removed by 42 U.S.C. § 2000e–2(j) which expressly states that 'preferential treatment [is not to be given] to any individual * * * on account of [a racial] imbalance which may exist.' "

In ruling against the plaintiff in the *McFadden* case, this Court said the following (352 F.Supp. at 410):

"Similarly, the statistics relied on by plaintiff in this case are not sufficient to overcome the substantial evidence in the record showing that he has not been denied employment as a checker because of his race. Other than these statistics, there is no support in this record for plaintiff's claim that the union defendants have denied him equal employment opportunities."

The *McFadden* decision was affirmed by the Fourth Circuit in a *per curiam* Opinion. McFadden v. Baltimore Steamship Trade Association, 483 F.2d 452 (4th Cir. 1973).

Here, as in *McFadden*, the plaintiffs rely principally on statistics in support of their claim of racial discrimination. In addition, the plaintiffs in this case have introduced the expert testimony of a statistician who gave his interpretation of the statistics in evidence. By agreement, the deposition of Dr. William E. Sedlacek, an Associate Professor of the Department of Measurement and Statistics at the University of Maryland, was introduced as evidence in this case. But the testimony of Dr. Sedlacek adds little to the figures themselves. He concluded, as is plainly shown by the statistics, that on the average members of Local 829 worked more hours each year than did members of Local 858. Dr. Sedlacek declined to render any opinion as to the cause of this difference, stating only that racial discrimination might be the possible cause.

But plaintiffs' claims here are not being asserted by an average or typical member of Local 858, and little weight can be given in a case such as this one to median or mean figures. What must be determined here is whether the plaintiff Wilburn and the plaintiff Young were denied work because of their race or whether they failed to accumulate the hours necessary for maximum pension benefits because of other reasons.

The evidence in this case shows that plaintiff Wilburn did not accumulate a sufficient number of hours to qualify for maximum retirement benefits not because of his race but because of his work habits. Longshoremen in the Port of Baltimore have for many years worked

under the so-called "gang system", which was described in the *ILA* case in the following terms (319 F.Supp. at 740):

"In the Port of Baltimore, labor is supplied to stevedoring companies for the purpose of loading and unloading vessels in accordance with the so-called 'gang system'. Most ports along the Atlantic and Gulf Coasts use a similar system, although a few ports use a daily shape-up system based exclusively on seniority. Under the gang system, the leader or gang carrier forms a group of some 15 to 20 regular members. A normal gang consists of 8 men in the hold, 2 winch drivers, 4 deckmen, and a gang carrier. Gangs from both Locals 829 and 858 are referred to the stevedoring companies as a result of telephone calls to the hiring halls during the afternoon of the day before the men are needed for the work. Many gangs are assigned to particular employers and are regularly called by such employer when work is available. If more gangs are needed on a particular day in addition to those regularly assigned, the employer will specifically request another gang or will accept one from those available.

"A new member of a Local first obtains work with a particular gang as an extra man or as a replacement whenever men are needed to increase the size of a gang or to fill a vacancy within the gang. When a regular vacancy occurs in a gang because of death, retirement or for any other reason, the gang carrier is the individual who selects the new member. A new member of a gang normally begins by performing less desirable work in the hold of a ship. There is an informal line of progression whereby such a member may work up to the more desirable top-side jobs. If a gang carrier leaves, the gang itself elects a new leader who is usually a member of the gang."

During the many years of his employment on the waterfront, Wilburn never worked on a regular basis as a permanent member of a particular gang.[13] Ordinarily, he was an extra and was never associated with any one gang for more than a few years at a time. In the course of his testimony, Wilburn explained why he did not become a part of a particular gang on a regular basis. A part-time preacher, he refused to socialize with others working on the waterfront. Wilburn was a family man and objected to the foul language, drinking and partying which was characteristic of many longshoremen who were permanently attached to a gang. On occasion, he rejected work because he did not like the members of a particular gang. At other times, he refused to make a cash payment to a regular gang member who wished to take a day off and who had offered to give Wilburn his job in return for $5.00 or more.

Unfortunately, Wilburn's high moral values and commendable attributes worked to his disadvantage in securing steady employment on the waterfront. To support his large family, he turned to other types of work and on occasion would not even report to his Local's hiring hall. During the same period of time when he was a longshoreman, Wilburn operated a part-time business cutting pulp wood and owned several power saws and trucks which were used in the conduct of this business.

To qualify for maximum pension benefits, Wilburn needed six more years of working over 700 hours. The evidence shows that medical problems were responsible for his failure to achieve the necessary number of hours in two of those years. In the 1955 contract year, he did not work on the waterfront at all because of disabling injuries he had suffered. In the 1960 contract year, Wilburn suffered a nervous breakdown and was told by his doctor not to work. He

13. At different times, he worked for Page's Gang, Coleman's Gang, Moore's Gang and Curtis' Gang.

recorded only 99 hours of work in that year. It is significant to note that other black longshoremen who worked with Wilburn did qualify or would have qualified for maximum retirement benefits under the Pension Plan. Oscar C. Jones and Calvin E. Herbert, who worked with Wilburn as members of Page's Gang and Coleman's Gang respectively, each qualified readily for the maximum retirement benefits of $400 per month. Co-workers Ernest Lee Conway (Page's Gang) and Eugene Herbert (Coleman's Gang) would have qualified had they applied for pension benefits. Herbert has not yet retired, and Conway died in June 1968 before seeking pension benefits. These men were regular members of their gangs and thus were easily able to record a sufficient number of hours to qualify for the maximum benefits. Had Wilburn been denied work because of his race, presumably his co-workers, who were also black, would similarly have been subjected to such discrimination. When the evidence is weighed and considered in its entirety, the proof in this case does not show that the failure of plaintiff Wilburn to qualify for maximum benefits is attributable to his race.

Plaintiff Young did not record a sufficient number of hours to become eligible for maximum benefits because of a different reason, likewise unrelated to his race. Young first worked as a longshoreman in 1944 but was convicted of rape in a state court in 1945 and was sentenced to a term of five years imprisonment. He was confined in the Maryland Penitentiary for four years and two months and was thus not able to work on the waterfront during that time. In the contract year 1946, Young thus recorded only 8 hours; in the contract years 1947 and 1948, he recorded no hours; and in the contract year 1949 following his release from prison, he recorded 229 hours. Had Young been able to work 700 hours or more in any two of those

four contract years, he would have qualified for maximum retirement benefits.

In three other contract years, namely 1956, 1958 and 1959, Young did not work the necessary 700 hours or more. The evidence does not show that he failed to reach the qualifying figure because of his race. In the 1958 contract year, Young's employer went to Delaware and took Young's records with him. Young testified that he believed he had worked more than 700 hours in that year but could not prove it. Young described himself as a "floater" who did not connect up with a regular gang until he became a permanent member of Page's Gang in the contract year 1960. Every year thereafter, he recorded at least 700 hours of work.[14]

When Young applied for pension benefits in 1972, he was advised that if he waited for two years before filing his application he would then be eligible to receive the maximum benefits. Such a result would be achieved because the 1973 and 1974 contract years would, under the provisions of the Plan, be counted as a part of his continuous employment, even if he did not record any hours at all, and he would then show 700 hours of work for 20 of the 25 preceding continuous years. However, Young elected to have his application processed in 1972, knowing that his benefits would then be fixed at the lower level.

On cross-examination, Young conceded that his race had not prevented him from working the required 700 hours or more in the years in question but maintained that racial considerations prevented him from accumulating more than 1300 hours. But this larger figure has no significance in this case. Like Wilburn's proof, the evidence produced in support of Young's claim does not show that this plaintiff failed to qualify for maximum pension benefits because of his race.

---

14. In eight of those twelve years, he recorded over 1100 hours of work.

## The Count 2 claims

Count 2 of the amended complaint alleges that defendant ILA breached its duty to fairly represent the plaintiff in violation of Section 301 of the National Labor Relations Act, 29 U.S.C. § 141 et seq., and that the other defendants knowingly participated in such violation. See Steele v. Louisville & Nashville Railroad, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944); Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). Like the claims asserted in Count 1, plaintiffs contend under Count 2 that the defendants denied them employment on the waterfront because of their race.

■ The same proof is relied upon by the plaintiffs in support of the claims asserted under both Counts. But, as this Court has found, the proof in this case does not support allegations of racial discrimination. Thus, the facts here do not show that defendant ILA's conduct toward plaintiffs was arbitrary, discriminatory or in bad faith. See Vaca v. Sipes, *supra* at 207. For the same reasons stated hereinabove as to Count 1, plaintiffs are not entitled to declaratory or injunctive relief or to damages under Count 2.

## The Count 3 claims

Relying on 29 U.S.C. § 186(c), plaintiffs claim under Count 3 that the provisions of the Pension Plan establishing eligibility requirements are arbitrary and capricious as applied to them. Plaintiffs contend that the Trustees of the Fund have violated their fiduciary responsibilities in amending the trust provisions as they did, and plaintiffs ask this Court to order the Trustees to pay them maximum pension benefits.

When the carefully drawn, detailed provisions of the National Labor Relations Act are considered in their entirety, it seems hardly likely that Congress intended by means of the provisions of § 186(c) to confer civil jurisdiction on a federal court to determine the reasonableness of a pension agreement between an employer and a labor organization. Subsections (a) and (b) of 29 U.S.C. § 186 prohibit payments of money or other things of value by an employer to a labor organization. Criminal penalties are provided by Subsection (d), while Subsection (e) confers civil jurisdiction on district courts to restrain violations of the statute. Subsection (c), relied upon here by plaintiffs, sets forth detailed exceptions to the general prohibitions of the statute and excludes, *inter alia*, the payment of money to a trust fund established for the benefit of employees and their families. Only if a trust satisfies the requirements of Subsections (c)(5)(A)–(c)(5)(C) will payments to it be excepted from the prohibitions of § 186. Relying on Roark v. Lewis, 130 U.S.App.D.C. 360, 401 F.2d 425, 429 (1968), plaintiffs assert that this language of § 186(c)(5) empowers this Court to review the provisions of a pension fund such as the one involved in this case and determine whether such provisions are arbitrary or capricious.

In the *Roark* case, retired coal miners sought benefits under a pension fund established by the United Mine Workers and employers in the industry. Although they had worked in the mines from 29 to 42 years, the plaintiffs had been denied any benefits at all because their last regular employment in the industry was not with a contributing employer. The district court had granted summary judgment for the defendants. On appeal, the United States Court of Appeals for the District of Columbia reversed and remanded the case to the lower court for a hearing to determine the reasonableness of the disqualifying requirement as applied to the plaintiffs. In its opinion, the Court said this (at pages 428–429):

"We recognize that by their very nature most eligibility requirements established in this type of trust are colored to greater or lesser degree by an element of arbitrariness. There are often, however, excellent reasons which impel and require the establishment of a positive line of demarca-

tion separating the eligible from the non-eligible. Basically it is the responsibility of the parties and Congress to determine the appropriateness of the pension plans *with the court's participation limited to affirmative action only in those cases where the eligibility requirements are so patently arbitrary and unreasonable as to lack foundation in factual basis and/or authority in governing case or statute law.*" (Emphasis added)

Assuming that the Roark decision would be followed in this Circuit and that this Court has jurisdiction under § 186(c)(5) to consider the claims asserted under Count 3, the record in this case shows no such patently arbitrary and capricious action on the part of the Trustees to require the re-writing by this Court of the trust provisions. Unlike the plaintiffs in *Roark,* neither plaintiff here has been denied a pension. The sole question in this case is whether they are entitled to the increased benefits established by the Thirteenth and Sixteenth Amendments to the Plan.

The evidence in this case shows that these Amendments were adopted only after actuarial and other studies had been undertaken.[15] Pension consultants were hired by the Fund to submit recommendations concerning the effect of various proposed amendments. The actuarial effect of various eligibility requirements were considered by these consultants, and a report was submitted to the Trustees before final action was taken on the proposed amendments.

Under any trust agreement such as this one, the line must be drawn somewhere. The Trustees here selected eligibility requirements which in their judgment would have made benefits available to as many retired or retiring longshoremen as possible but which still would be actuarially sound. It was hardly unrea-

sonable to require that a longshoreman work 700 hours or more for 20 out of 25 consecutive years before he would be eligible to receive the increased benefits which were available because of increased employer and other contributions. Nor was it unreasonable to require that an applicant for a pension accumulate at least 400 hours before his period of continuous work could commence.

■ Undoubtedly there are many longshoremen, both black and white, who did not qualify for regular or maximum benefits either because they did not accumulate the necessary hours worked in a sufficient number of years or because they had not worked enough continuous years. Were plaintiffs successful here, many other retired or retiring longshoremen would similarly be entitled to receive pension payments from the Fund, with incalculable actuarial effects on the entire Fund. It is concluded that, assuming jurisdiction exists to make such a determination, the eligibility requirements of this Pension Plan are not so patently arbitrary and unreasonable that this Court should require that the trust agreement be rewritten so as to award increased benefits to the plaintiffs. It is for the trustees, not judges, to choose between various reasonable alternatives. Roark v. Lewis, *supra* at 429.

## *Conclusion*

For the reasons stated, the plaintiffs are not entitled to recover damages nor are they entitled to the declaratory or injunctive relief sought. Judgment is therefore entered in favor of each defendant herein, with costs. This Court's findings of fact and conclusions of law under Rule 52(a) of the Federal Rules of Civil Procedure are embodied in this Opinion, whether or not expressly so characterized.

---

15. In *Roark*, the Court recognized "that there may well be actuarial considerations which might become pertinent through competent evidence." 401 F.2d at 429.